## BOARD OF EDUCATION OF MONTGOMERY COUNTY, Plaintiff,

### v.

## BRETT Y., et al., Defendants.

### Civ. A. No. DKC 97–364.

United States District Court, D. Maryland.

March 26, 1997.

---

Zvi Greismann, Montgomery Co. Public Schools, Senior Atty., Rockville, MD, Janet Pitterle Holt, Washington, DC, for plaintiff.

Matthew B. Bogin, Michael J. Eig, Bogin and Eig, Washington, DC, for defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

This is an action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by the Board of Education of Montgomery County ("the Board") to appeal the decision of a state administrative law judge, who found that Brett Yader was denied a free appropriate public education for the 1996–97 school year and granted his parents' request for reimbursement of the cost of Brett's residential placement at the Grove School ("Grove"), a private institution in Madison, Connecticut. Defendants, an emotionally disturbed student and his parents, have filed a motion for a preliminary injunction, seeking an order from this court that Plaintiff is required to maintain Brett's placement at Grove through the remainder of the school year, which heretofore Defendants have been funding at their own expense. A hearing was held on March 18, 1997, and the court is now prepared to issue a ruling. For the reasons that follow, Defendants' motion for a preliminary injunction will be granted.

## I. BACKGROUND

Brett Yader[1] is a sixteen year old student who is seriously emotionally disturbed.

---

1. Although Plaintiff filed its complaint against "Brett Y.," following the convention in IDEA cases of not disclosing the student's identity, Defendants' counsel at the hearing on the present

Brett has been diagnosed with severe anxiety disorder, depression, oppositional/defiant disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"). Accordingly, he is eligible for special education services as a student with disabilities pursuant to the IDEA.

For the 1994–95 and 1995–96 school years, Brett attended school in the Montgomery County, Maryland Public School System ("MCPS"). During the 1994–95 school year, Brett's grades began to deteriorate. In May 1995, Brett was diagnosed with ADHD. The following fall, Brett began ninth grade at Richard Montgomery High School ("Richard Montgomery"). By December 1995, concern over his poor class attendance prompted a "screening meeting," which led to an Admission, Review, and Dismissal ("ARD") evaluation meeting on January 17, 1996. Brett's parents attended this meeting, and an Individualized Educational Program ("IEP") was developed for Brett. The IEP indicated Brett's disability as "other health impaired," and called for Brett to receive Intensity II special education services for the remainder of the 1995–96 school year at Richard Montgomery. During the remainder of the year, however, his attendance and school performance declined, and his behavior at home became increasingly angry, moody, and occasionally violent. In June 1996, Brett went into crisis; he stopped attending school altogether, he slept all day and was up at night, and refused to leave his bed or his home.

On June 19, 1996, MCPS convened an ARD meeting to develop an IEP for the 1996–97 school year for Brett. At that meeting, some of the IEP's goals and objectives were adjusted, and Brett was coded as "seriously emotionally disturbed." The ARD committee determined that Brett's needs could not be met at Richard Montgomery, and recommended a therapeutic day school. The ARD committee referred its recommendations to the Central Admission, Review, and Dismissal ("CARD") committee for a placement decision.

A CARD meeting was not convened, however, until August 30, 1996; the reason for the delay is the subject of a dispute between the parties. At that meeting, the

CARD committee referred Brett for an interview at the Regional Institute for Children and Adolescents ("RICA") in Rockville, Maryland, and told the Yaders that a place was being held for Brett at RICA for the 1996–97 school year. Apparently, however, this referral did not fully constitute an offer of placement, because RICA makes its own determinations of whom to accept into its program. The MCPS's 1996–97 school year began on September 3, 1996. Brett interviewed at RICA on September 4, 1996, and the Yaders were notified on September 12, 1996 that Brett had been accepted to RICA's residential program.

In the meantime, however, the Yaders on July 15, 1996 had requested a due process hearing, to challenge MCPS's alleged failure to provide Brett with a free appropriate public education ("FAPE"), as required by the IDEA. The Yaders also applied for Brett to attend Grove, a private residential school for severely emotionally disturbed students located in Madison, Connecticut, and Brett was accepted to Grove on or about July 17, 1996. By August 26, 1996, the Yaders apparently had decided that Brett would be attending Grove, and he enrolled there on September 6, 1996. Brett reportedly has made progress since enrolling at Grove; he attends classes regularly and his mood and behavior have begun to improve.

On October 1, 1996 and November 1, 1996, a due process hearing was held before Administrative Law Judge ("ALJ") Patricia Rynn Sylvester. In her decision, issued December 16, 1996, Judge Sylvester found that MCPS had committed serious procedural violations of the IDEA, which denied Brett a FAPE. These serious violations included failing to develop an appropriate IEP for the 1996–97 school year, and failing to provide an appropriate educational placement at the commencement of the 1996–97 school year. Judge Sylvester also found that the placement at Grove was proper. Judge Sylvester therefore held that the Yaders were entitled to reimbursement for the cost associated with their unilateral placement of Brett in

motion indicated that it was not necessary to

conceal the student's identity in this case.

the residential program at Grove for the 1996–97 school year.

The Board has filed an action in this court to challenge Judge Sylvester's ruling. In the meantime, Brett has remained at Grove at the Yaders' expense. The Yaders have paid Brett's tuition at Grove through March 1997, but apparently are unable to continue to do so beyond that point. The Yaders now seek from this court a preliminary injunction to require the Board to maintain Brett's placement at Grove through the remainder of the school year at the Board's expense, pending the resolution of the merits of the Board's appeal.

## II. DISCUSSION

### A. IDEA STATUTORY FRAMEWORK

The IDEA, known originally as the Education of the Handicapped Act, was enacted in order "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). To accomplish this objective, the IDEA provides federal money to state and local educational agencies that undertake to implement its requirements. *School Comm. of the Town of Burlington v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985) (citing *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 179–84, 102 S.Ct. 3034, 3037–40, 73 L.Ed.2d 690 (1982)). To be eligible for federal funding, states and local agencies are required to comply with federal guidelines and regulations established to ensure the availability of a FAPE for all of their disabled children. 20 U.S.C. § 1412. The state and local agencies are required to comply not only with the substantive requirements of the IDEA, but also the elaborate system of "procedural safeguards" that the IDEA extends to children with disabilities and their parents. These procedural safeguards are meant to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think are inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S.Ct. 592, 597–99, 98 L.Ed.2d 686 (1988).

Among the procedural safeguards that a state must provide parents is the opportunity to convene "an impartial due process hearing," to resolve their complaints. *See* 20 U.S.C. § 1415(b)(2). Maryland has provided for such hearings to be provided through the Office of Administrative Hearings ("OAH"). The hearings are held before ALJs, in this case Judge Sylvester, whose rulings may be appealed in state or federal court.

In addition to requesting a due process hearing, parents who believe that their child is being denied a FAPE also may choose unilaterally to withdraw their child from the public school system and place the child in a private institution at their expense, as the Yaders did in this case. If, upon completion of the administrative and judicial review process, it is determined that the offered public placement was inappropriate and the private placement was appropriate, the parents may then be entitled to reimbursement from the school system for their expenditures on private special education for their child. *Burlington*, 471 U.S. at 369–70, 105 S.Ct. at 2002–03; *see also Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12, 15, 114 S.Ct. 361, 364, 366, 126 L.Ed.2d 284 (1993). The right to reimbursement may be predicated either on substantive or serious procedural violations by the school system. *See. e.g., Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 815 (4th Cir.1988); *Hudson v. Wilson*, 828 F.2d 1059, 1063 (4th Cir.1987); *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985).

### B. THE "STAY PUT" PROVISION

Disputes often arise over the proper placement and educational program for a disabled student, and the review process described above can be cumbersome and lengthy. Therefore, a child's placement during the course of administrative and judicial proceedings typically has great significance for all concerned. *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 82 (3d Cir.1996); *see also Burlington*, 471 U.S. at 361, 105 S.Ct. at 1998 ("important practical questions arise concern-

ing interim placement of the child and financial responsibility for that placement").

The IDEA requires that during the course of administrative and judicial proceedings, "unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement...." 20 U.S.C. § 1415(e)(3). This requirement has come to be known as the IDEA's "pendent placement" or "stay put" provision. *Susquenita*, 96 F.3d at 82. This provision

> represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.

*Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864–65 (3d Cir.1996) (citing *Woods v. New Jersey Dep't of Educ.*, No. 93–5123, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept. 17, 1993)).

Courts have held, and both parties agree, that the "stay put" provision affords an "automatic" preliminary injunction to maintain the child's placement, eliminating the need for parents to make the usual showing required for obtaining preliminary injunctive relief. *See Honig*, 484 U.S. at 326, 108 S.Ct. at 606; *see also, e.g., King v. Pine Plains Cent. Sch. Dist.*, 918 F.Supp. 772, 783 (S.D.N.Y.1996); *Cochran v. District of Columbia*, 660 F.Supp. 314, 319 (D.D.C.1987); *Saleh v. District of Columbia*, 660 F.Supp. 212, 215 (D.D.C.1987). The central question thus becomes: what is Brett's "current educational placement"?

## C. CURRENT EDUCATIONAL PLACEMENT

Given the protective purpose underlying the "stay put" provision, it is typically invoked by a child's parents in order to maintain a placement where the parents disagree with a change proposed by the school district; the provision is used to block school districts from effecting unilateral change in the child's educational program. *Susquenita*, 96 F.3d at 83; *cf. also Honig*, 484 U.S. at 323, 108 S.Ct. at 604 ("We think it clear ... that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students ... from school"); *Burlington*, 471 U.S. at 373, 105 S.Ct. at 2004 ("We think at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings"). In cases of this type, "the dispositive factor in deciding a child's 'current educational placement' should be the Individualized Education Program ... actually functioning when the 'stay put' is invoked." *Drinker*, 78 F.3d at 867 (quoting *Woods*, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) at 440).

■ The instant case is quite different from the typical case, however. In this case, it is the parents who advocate change. The Yaders had no desire for Brett to continue at Richard Montgomery, nor, apparently, did they want him to attend RICA. Instead, the Yaders chose to place Brett at Grove at their own expense and seek reimbursement. The Yaders apparently would concede that Richard Montgomery, or perhaps RICA, would have been the appropriate pendent placement within the meaning of the IDEA at the time that they unilaterally placed Brett at Grove. They argue, however, that when the ALJ rendered her decision in their favor, Grove became Brett's pendent placement. The Board apparently takes the position that Brett's current educational placement is Richard Montgomery, but, in any event, that it is *not* Grove.

As noted above, the "stay put" provision reads as follows: "During the pendency of any proceedings conducted pursuant to this sections, *unless the state or local educational agency and the parents or guardian otherwise agree*, the child shall remain in the then current educational placement...." 20 U.S.C. § 1415(e)(3) (emphasis added). In *Burlington*, although the issue was the parents' entitlement to reimbursement, the Supreme Court had occasion to consider what constitutes "agree[ment]" by the state for purposes of this provision. In *Burlington*, the Town argued that the parents were not entitled to reimbursement, in part because

they violated the "stay put" by unilaterally placing their child in a private school. In considering this argument, the Court stated that "[t]he [appellate panel]'s decision in favor of the [parents] and the [private school] placement would seem to constitute agreement by the State to the change of placement." 471 U.S. at 372, 105 S.Ct. at 2004. The Court went on to hold that as of the date that the state administrative decision was rendered in the parents' favor, the parents were no longer in violation of § 1415(e)(3). *Id.*

The only two United States Courts of Appeals to have squarely addressed the issue have concluded that the Supreme Court's decision in *Burlington* compels the conclusion that once parents receive a state administrative decision that the offered public placement was inadequate and their unilateral private placement was appropriate, the private placement becomes the "current educational placement," and the school system is financially responsible for the cost of that placement during the pendency of the underlying litigation. *See Susquenita,* 96 F.3d 78; *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings,* 903 F.2d 635 (9th Cir. 1990).[2]

In *Susquenita,* a case very similar to the instant case, the Court of Appeals for the Third Circuit was called upon to decide whether the parents of a child with disabilities were entitled to have their daughter's private school placement funded by the local public school district prior to the conclusion of litigation establishing the propriety of that placement. Relying on § 1415(e)(3) and *Burlington,* the court of appeals held that the parents were so entitled.

In *Susquenita,* the parents rejected the school system's proposed IEP for their daughter Raelee, withdrew her from public school, and placed her in a private school for the learning disabled. The parents then invoked their right to a due process hearing in order to determine whether Raelee had been properly placed and, accordingly, whether they were entitled to tuition reimbursement. The hearing officer found that the IEP which Susquenita had proposed was appropriate and denied reimbursement. The parents appealed this decision to a three member state special education appeals panel.[3] The panel reversed the hearing officer's decision, finding that the IEP was deficient and that the program offered by the private school was appropriate for Raelee. The panel then stated, in dicta, that unless their order were overturned in a state or federal court, the private school placement would constitute Raelee's pendent placement. Susquenita appealed the panel's decision to the United States District Court for the Middle District of Pennsylvania, and requested a stay of the panel's decision pending its appeal. The district court denied the motion for a stay, effectively directing that the student remain in the private school placement and that this placement be funded by the school district pending resolution of the merits of the underlying litigation. Susquenita appealed, and the Third Circuit held that the district court properly declined to enter a stay.

The parents argued, and the Third Circuit agreed, that the panel decision constituted "agreement" by the State to a change of placement, and that therefore a new pendent placement was created for which the school district was obligated to pay. The court reasoned as follows:

> The decision of the Supreme Court in *Burlington* established that a ruling by the education appeals panel in favor of the parents' position constitutes agreement for purposes of section 1415(e)(3). . . .
>
> Susquenita argues that a pendent placement appropriate at the outset of administrative proceedings is fixed for the duration of the proceedings and cannot be altered by an administrative ruling in the parents' favor. Accepting this position

---

2. At least one district court has reached the same conclusion. *See Department of Educ. of Hawaii v. Mr. and Mrs. S.,* 632 F.Supp. 1268 (D.Hawai'i 1986). Another district court reached this conclusion prior to *Burlington. See Blazejewski v. Board of Educ. of Allegany Cent. Sch. Dist.,* 560 F.Supp. 701 (W.D.N.Y.1983).

3. Under the IDEA, states may have either a one-tier or a two-tier administrative review system. *See* 20 U.S.C. § 1415(b)(2) & (c). Pennsylvania apparently has a two-tier system; Maryland has a one-tier system.

would contravene the language of the statute and the holding in *Burlington*. Furthermore, it would mean that the panel decision in favor of the parents is of no practical significance unless and until it is affirmed by a decision that cannot be or is not appealed.

As we have explained, section 1415(e)(3) was drafted to guard the interests of parents and their children. We cannot agree that this same section should be used here as a weapon by the Susquenita School District to force parents to maintain a child in a public school placement which the state appeals panel has held inappropriate. It is undisputed that once there is state agreement with respect to the pendent placement, *a fortiori*, financial responsibility on the part of the local school district follows. Thus, from the point of the panel decision forward—academic year 1995–1996 and following—Raelee's pendent placement, by agreement of the state, is the private school and Susquenita is obligated to pay for that placement.

*Susquenita*, 96 F.3d at 83–84 (footnote omitted).

In addition to relying on the statutory language and the Supreme Court's *Burlington* decision, the *Susquenita* court found that the policies underlying the IDEA and its administrative process supported its conclusion:

In this case, as in many other cases, where parents who disagree with an IEP proposal for their child wait for the merits of their case to be addressed through the process of administrative and judicial review, they must make a choice. They may have the child remain in what they believe to be an inappropriate placement or they may elect to pay for what they deem appropriate. This choice is real only for parents who have the financial wherewithal to pay for alternative placement. While parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position. The purpose of the Act, which is to ensure that every child receive a "free and appropriate education" is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education.

The burden that such an approach would place on many families is overwhelming.... Without interim financial support, a parent's "choice" to have his child remain in what the state has determined to be an appropriate private [sic] placement amounts to no choice at all. The prospect of reimbursement at the end of the litigation turnpike is of little consolation to a parent who cannot pay the toll at the outset.

*Id.* 96 F.3d at 86–87 (footnotes omitted).

In *Clovis*, the Court of Appeals for the Ninth Circuit likewise considered parents' argument that a state administrative decision in favor of their unilateral placement decision created a "new" pendent placement for purposes of the "stay put" provision. Relying on *Burlington*, the court concluded that, under the "stay put" provision, the school district was responsible for maintaining the student's private placement after the administrative decision that the placement was appropriate, and until a court directed otherwise. *Clovis*, 903 F.2d at 641.

The only potentially significant distinction between *Susquenita* and *Clovis* on the one hand and the instant case on the other, is that in those cases the challenges that led to the administrative decisions in the parents' favor were substantive, whereas the challenge in this case was procedural. In other words, in *Susquenita* and *Clovis*, the parents challenged the substantive adequacy of the school systems' proposed placements, and so the state administrative agencies had occasion to conclude that the school systems' proposed placements were inadequate and that the parents' choices of placement were proper. The panel in *Susquenita* even went so far as to state that the parents' choice of private placement should remain the student's pendent placement. In this case, on the other hand, the Yaders won their administrative ruling on the ground that MCPS had committed serious procedural violations of the IDEA. The court does not think, how-

ever, that this distinction forecloses reliance on *Susquenita* and *Clovis* in this case. Significantly, Judge Sylvester did explicitly determine that Brett's placement at Grove was proper. This conclusion was necessary to her holding that the Yaders were entitled to reimbursement of the cost associated with their unilateral placement of Brett. *See Florence,* 510 U.S. at 15, 114 S.Ct. at 366; *Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002. Furthermore, there is no dispute among the parties that Richard Montgomery was not an appropriate placement, and while Judge Sylvester did not explicitly find that RICA would not be an appropriate placement (she had no occasion so to find, because a placement at RICA was not in effect at the time the Yaders unilaterally enrolled Brett at Grove), she did conclude that the Board's recommendation of an initial placement at Richard Montgomery with a transition to RICA would not have been feasible under the circumstances. In sum, given Judge Sylvester's conclusions that MCPS denied Brett a FAPE for the 1996–97 school year and that his placement at Grove was proper, the court believes that her ruling can be said to constitute state "agreement" to a change in placement to Grove, within the meaning of *Susquenita* and *Clovis.*

The one decision that the Board cites as contrary authority, *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618 (6th Cir.1990), although it contains some language helpful to the Board's position, is not directly on point.[4] In *Thomas,* Emily, a severely retarded, multi-handicapped individual who was confined to a wheel chair, was supposed to be receiving home education one day per week, but actually was receiving it only once every two weeks. After receiving a physician's opinion that the home training was insufficient to meet Emily's needs, Mrs. Thomas met with a team of school system personnel in order to

develop an IEP for Emily. The IEP team decided that the appropriate placement for Emily would be in a school-based program. Before the IEP was implemented, however, several developments caused the IEP team to believe that their initial recommendation was wrong, and they developed a revised IEP according to which Emily would receive daily home instruction. Mrs. Thomas requested a due process hearing, and the hearing officer concluded that the school-based program was more appropriate. The school system appealed the decision to the State Level Reviewing Officer, who reversed the hearing officer's decision and ruled in favor of the home-based IEP.

In federal court, Mrs. Thomas argued, *inter alia,* that the school system violated the "stay put" provision; according to her, Emily's "then current educational placement" was the IEP in its original agreed upon form before its attempted revision. In rejecting this argument, the Court of Appeals for the Sixth Circuit stated as follows:

> Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stayput provision. And where, as here, the dispute arises before any IEP has been implemented, the "current educational placement" will be the operative placement under which the child is actually receiving instruction at the time the dispute arises.

*Thomas,* 918 F.2d at 625–26. Attempting to bring its argument that Grove is not Brett's current educational placement within the purview of the *Thomas* opinion, the Board states that "[i]n the instant case, Brett was attending Richard Montgomery at the time his parents requested an ARD meeting to address his problems."

---

**4.** The Board also repeatedly cites the statement in the Supreme Court's *Florence* opinion that parents "are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act," 510 U.S. at 15, 114 S.Ct. at 366, emphasizing the "only" and "federal court." The Board's reliance on *Florence* is misplaced. All that this statement from *Florence* means is that parents

are not entitled to reimbursement for a unilateral private placement until the merits of the dispute are resolved in their favor. The Yaders are not, however, seeking a reimbursement order from this court. Any decision on reimbursement will, of course, have to await the court's consideration of the merits of the Board's appeal. All the Yaders seek at this point is an order requiring the Board to maintain Brett's Grove placement, and so *Florence* simply is inapposite.

The *Thomas* decision will not support the weight that the Board wants to place upon it, however, because it is clear that the *Thomas* court did not confront the issue presently before this court, namely, whether a ruling by the state administrative agency in favor of the parents' placement constitutes an agreement to a change in placement within the meaning of the "stay put" provision such that the school system therefore properly may be saddled with the cost of maintaining that placement during the pendency of the litigation. First of all, the *Thomas* case was not about maintaining a placement, or even about reimbursement for a placement. What the parent was seeking in *Thomas* was an equitable award of compensatory education (six years of education during summer vacations and an extension of the school system's obligation to Emily past her twenty-second birthday) to make up for the time that Emily allegedly was deprived of a FAPE; Mrs. Thomas merely tacked on the stay put argument to a list of procedural violations she felt contributed to the school system's failure to provide a FAPE. Furthermore, the state administrative agency did *not* rule in Mrs. Thomas's favor; while the initial hearing officer agreed with Mrs. Thomas that the school-based placement was the proper placement, the state level officer agreed with the school system that the home-based IEP was proper. Therefore, there was no state "agreement" with the parent, as in *Burlington, Susquenita,* and *Clovis.* Finally, it is clear that Mrs. Thomas did not make a stay put argument based on the state administrative hearing decisions, or, if she did, the court of appeals did not address it. There is no discussion of *Burlington* anywhere in the *Thomas* opinion, nor is there mention of any agreement other than the "original agreed upon form" of the IEP, developed by the IEP team and agreed to by Mrs. Thomas.

In light of the emerging case law in this area, as exemplified by *Susquenita* and *Clovis,* and the apparent lack of any contrary authority, the court is persuaded that the state administrative decision in favor of the Yaders constitutes "agreement" by the State to a change in Brett's educational placement to Grove within the meaning of the "stay put" provision of the IDEA, thereby entitling the Yaders to a preliminary injunction requiring the Board to maintain Brett's placement at Grove at the Board's expense.

### D. SCOPE OF RELIEF

The court wishes to emphasize the fairly narrow scope of its holding and of the relief granted. There are four distinct time periods involved in this case: (1) the period of time after the Yaders unilaterally placed Brett at Grove but before the ALJ rendered her decision; (2) the period after the ALJ's decision but before the date upon which the Yaders request that preliminary injunctive relief begin;[5] (3) the period between April 1, 1997 and the end of the school year; and (4) the period after the present school year. This court's analysis and ruling deal only with the third time period.

As to the first time period, as mentioned above, the law is clear that parents who unilaterally place their child in a private school do so at their own risk, and reimbursement may be ordered only after the merits are resolved judicially. The Yaders do not make, and the court would not in any event consider, a reimbursement order at this juncture for their expenditures prior to the ALJ ruling in their favor. As to the second time period, the Yaders presumably could have come to this court immediately following the issuance of the ALJ's decision, seeking a preliminary injunction under the "stay put" provision. They did not do so, however, apparently waiting instead to see if the Board would appeal. Because the Yaders already have paid for Brett's education at Grove for the intervening months, requiring the Board to pay for these months now would be more in the nature of reimbursement than preliminary injunctive relief, and the court at this point declines to consider whether this would be appropriate. As to the fourth time period, the Yaders have based their stay put argument on an administrative ruling deciding only that Brett was denied a FAPE and

---

5. Although Defendants filed their preliminary injunction motion on February 26, 1997, Defendants' counsel at the hearing informed the court that the Yaders had paid Brett's tuition at Grove through the end of March 1997. Therefore, Defendants' counsel conceded that preliminary injunctive relief was needed only from that time forward.

that Grove is an appropriate placement for the 1996–97 school year. The court expresses no opinion on whether the ALJ's ruling can be said to constitute agreement by the State to Brett's placement at Grove beyond the current school year.

In sum, the court holds only that Judge Sylvester's December 1996 ruling constitutes an agreement by the State to change Brett's educational placement to Grove, and that the Yaders therefore are entitled to a preliminary injunction requiring the Board to maintain Brett's placement at Grove at the Board's expense through the remainder of the school year. An injunction requiring the maintenance of Brett's placement through the 1996–97 school year is necessary because, as is often the case, a trial on the merits of Brett's 1996–97 educational program may not be held until after the end of that year. The court fully expects, however, that all parties involved will work diligently and cooperatively toward having a mutually agreeable program for Brett in place well in advance of the start of the next school year.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for a preliminary injunction is GRANTED. Plaintiff is ORDERED to maintain Brett Yader's current educational placement at Grove through the remainder of the 1996–97 school year at Plaintiff's expense. A separate order will be entered.