Mark Andrew FRITSCHLE,
et al., Plaintiffs,

v.

John M. ANDES, et al., Defendants.

No. Civ. AMD 98–1694.

United States District Court,
D. Maryland.

April 23, 1999.

Matthew B. Bogin, Michael J. Eig, Bogin & Eig, Washington, DC, for plaintiffs.

P. Tyson Bennett, Eric C. Brousaides, Reese & Carney, LLP, Columbia, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

In this case, plaintiffs Mark and Diane Fritschle, (the "Fritschles"), the parents of a learning disabled son, Mark Andrew ("Drew"), allege that the Worcester County Board of Education and its superintendent, John Andes (together, "WCBE"), violated the Individuals with Disabilities Education Act, ("IDEA"), 20 U.S.C. § 1400 et seq.,[1] by failing to provide Drew with a free appropriate public education ("FAPE") for the 1996–97 school year.[2]

---

[1]. The IDEA was originally enacted as the "Education of Handicapped Act" in 1982. Congress amended the IDEA in 1997. See 20 U.S.C. § 1400 et seq. (West Supp.1998). The conduct in this case occurred prior to the enactment of these amendments. Although the amendments recodified some of the provisions in the IDEA to which I refer, I cite the provisions as codified prior to the 1997 amendments, noting, however, that the amendments enacted would make no difference to the decision in this case.

[2]. At the administrative level below, the Fritschles also challenged WCBE's actions for the 1995–96 school year, arguing that the school district's failure to assess Drew's learning disability and develop an IEP for him

After a due process hearing, an Administrative Law Judge ("ALJ") found that WCBE did not deprive Drew of a FAPE and denied the Fritschles' request for reimbursement for the expense of placing Drew in a private residential facility.

The Fritschles have appealed and seek an order from this court reversing the ALJ's decision denying reimbursement.[3] Pending before the court are the parties' cross motions for summary judgment. I have reviewed the administrative record and thoroughly examined the parties' submissions; no hearing is necessary. For the reasons discussed below, I will grant WCBE's motion for summary judgment.

## I. FACTS

Drew, who is 18, has qualified for special education services since he was seven years old.[4] He suffers from dyslexia, and experiences difficulty with reading, word identification and spelling.[5] With the exception of a portion of his fifth grade school year, Drew has always attended private school, at his parents' expense. During his short tenure in the Worcester County Public School system, Drew experienced educational and emotional difficul-

ties.[6] Consequently, for the remainder of the fifth grade, and until the completion of his eighth grade year, Drew attended the Salisbury School, a private school.[7] The Salisbury School is not a special education facility, however, it provided Drew with small classes and various learning accommodations; this was accompanied by one-to-one tutoring provided by the Fritschles.

In April 1995, Mrs. Fritschle approached school officials at the Stephen Decatur High School ("SDHS") about Drew's possible enrollment and inquired about special education services for the 1995–96 school year. Ultimately, in July 1995, the Fritschles enrolled Drew at the Kildonan School, a private residential facility in New York, which specializes in the education of dyslexic students. He has been educated by the Kildonan school since September 1995. At Kildonan, Drew's program includes a one-on-one language remediation tutorial five times a week for forty-five minutes a day, academic classes of 8–12 students and two hours of supervised study hall every evening. .

On December 6, 1995, the Fritschles requested a due process hearing. The

violated the IDEA. The ALJ ruled in favor of the Fritschles for the 1995–96 school year and ordered WCBE to reimburse the Fritschles for their expense in sending Drew to private school. Only issues surrounding the 1996–97 school year are under review here.

3. The Maryland State Department of Education and the state Superintendent of Education, Dr. Nancy Grasmick, were joined as third-party defendants in this case, but the claims against them have been dismissed. Additionally, WCBE sought to appeal the ALJ's ruling in favor of the Fritschles for the 1995–96 school year, but I concluded that its appeal was time-barred. *See Fritschle v. Andes*, 25 F.Supp.2d 699 (D.Md.1998), *motion for recons. denied*, 32 F.Supp.2d 314 (1999).

4. The IDEA provides special education services for "mentally retarded, hard of hearing, deaf, speech or language impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children or children with specific learning disabilities, who by reason thereof

require special education and related services." 20 U.S.C. § 1401(a)(1) (West 1990). The parties do not dispute that Drew has been identified as learning disabled.

5. Drew was first assessed for a learning disability by the Kennedy Krieger Institute in 1988. The Institute found that Drew was of "bright average intellectual potential" but suffered from "processing inefficiencies ... [and possessed] difficulty with rapid sequential auditory information." Drew has a "core deficit in phonological processing ... [and] difficulty in decoding unfamiliar words." Tr. at 268.

6. Similarly, administrators at the Salisbury School noted that Drew "exhibit[s] signs of frustration and poor self-esteem ... [and] is opposed to any type of overt help [that] singled [him] out as being different from his peers."

7. The Salisbury school does not educate students after the eighth grade.

parties agreed, however, to commence the ARD process, rather than proceed directly to a due process hearing.[8] The parties agreed that Drew should undergo additional evaluations and assessments. Thus, WCBE officials traveled to Kildonan to observe and evaluate Drew.[9] These assessments revealed that Drew was an average reader, with low-average written language skills and low writing skills.

WCBE convened a second ARD meeting on April 11, 1996. The Fritschles, their attorney and the members of the evaluation team attended. The academic dean of Kildonan also participated by speaker telephone. The ARD committee recommended that Drew receive Intensity III services at SDHS.[10] Drew would receive seven and a half hours of special education services per week, amounting to 90 minutes of special education in a separate classroom each day. In addition, the IEP specified that Drew was entitled to, *inter alia*, the following modifications: weekly progress reports to the Fritschles, possible utilization of alternatives to written assignments, extended time limits, use of taped books (when appropriate), preferential classroom seating, implementation of assisted note taking (when necessary), small group or individualized instruction and adjustment of the grading scale (if necessary).[11]

The Fritschles declined to sign the IEP. In June 1996 they requested another due process hearing. In August 1996, the ALJ appointed Dr. Burton Lohnes as an impartial expert to assess the IEP and evaluate Drew's placement. Both parties agreed to this order. Dr. Lohnes concluded that the IEP drafted for Drew's 1996–97 school year and Drew's placement at SDHS was not appropriate. WCBE did not implement Dr. Lohnes's recommendations and instead hired its own expert, Dr. Stanley Rosner.

The administrative hearing reconvened in May, August and September 1997. The ALJ first addressed the Fritshles' preliminary argument that Md.Code.Ann., Educ. § 8–413(c), which establishes a one-tiered administrative hearing process, should not be applied to them.[12] The ALJ concluded that the Office of Administrative Hearings had proper jurisdiction over the case and that the application of the one tiered administrative hearing procedure was not improper.

8. In Maryland, meetings dedicated to assess a student's special education needs and design an IEP are called "Admission, Review, and Dismissal" ("ARD") committee meetings. *See* COMAR 13A.05.01.08 & .09.

9. Lynne Barton, a special education teacher, Kathy Simon, a learning disability facilitator, Barbara Davenport, a school psychologist, Debbie Matthews, a health department counselor, and Glen Hammerbacher, the Special Education Supervisor went to Kildonan to evaluate Drew.

10. COMAR breaks down the level of special education services needed by a student into different intensities, indicated by the number of hours of services to be provided. *See* COMAR 13A.05.10A. Intensity III services are appropriate for a student who requires up to three hours of special education services per day in a maximum classroom size of 20 students per full-time special education teacher. *See* COMAR 13A.05.01.10E.

11. The IEP's annual goals were that Drew would: "(1) demonstrate improvement in spelling; (2) improve in use of punctuation and capitalization; (3) write a variety of sentence forms; (4) express ideas/experiences in writing using a variety of expression techniques; (5) improve functional writing skills; (6) write a letter for various purposes; (7) will improve word recognition skills."

12. At the time the administrative actions were filed in this case, Maryland had a two tiered system of review. *See* Md.Code Ann., Educ. §§ 8–415(a)(2)(I)–(ii), (b)(5) (Michie, 1995 Supp.). Effective July 1, 1996, Maryland eliminated the local hearing level and replaced the state review panel with a hearing before a single ALJ. *See* Md.Code.Ann., Educ. § 8–413(c)–(d). Parties who, as of July 1, 1996, had requested, but had not yet received a due process hearing under the old regime were to be covered under the new one-tiered provisions. I have already rejected the Fritschles' challenge to the Maryland statute. *See* 25 F.Supp.2d at 704.

As to the merits of the Fritschles' challenge, the ALJ concluded that WCBE did not fail to provide Drew with a FAPE and that the 1996–97 IEP and proposed placement at SDHS were appropriate. Therefore, she declined to order that WCBE reimburse the Fritschles for the cost of placing Drew in private school. The Fritschles timely appealed.

## II. IDEA STATUTORY FRAMEWORK

The IDEA was drafted to "assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). The "centerpiece" of this "free appropriate public education" is the individualized education program ("IEP") which is a collaboratively developed plan for a disabled child's education. *See Reusch v. Fountain*, 872 F.Supp. 1421, 1426 (D.Md.1994). "The IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used." *Sanger v. Montgomery County Bd. of Educ.*, 916 F.Supp. 518, 519 (D.Md.1996) (*citing* 20 U.S.C. § 1401(a)(20)(a)–(f); COMAR 13.-A.05.01.09). This written plan must be appropriately reviewed and revised. *See* 20 U.S.C. § 1414(a)(5).

■ The IDEA mandates that all disabled children are entitled to a FAPE. *See Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Supreme Court has not set forth a precise formula for determining what constitutes a FAPE. More generally, it has stated that the child must receive "access to specialized instruction and related services that are individually designed to provide educational benefit." *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034. Moreover, although a school system is not required to *maximize* a child's potential, *see id.* at 189, 102 S.Ct. 3034, it is imperative that the educational placement "be likely to produce progress, not regression or trivial educational advance." *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985), *cited with approval* in *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238 (3d Cir.1999) (reiterating earlier holding that "IDEA 'calls for more than a trivial educational benefit' and requires a satisfactory IEP to provide 'significant learning,' ... and confer 'meaningful benefit.' ") (citations omitted).

■ In addition, the IDEA confers upon a federal court power to "grant such relief as [it] determines is appropriate," 20 U.S.C. § 1415(e)(2), including the award of retroactive reimbursement for a parent's expense in unilaterally placing a child in private school. *See School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Thus, if the court determines that the IEP proposed by the school district is inappropriate and that the private placement chosen by the parents is proper, a court can order the school board to reimburse the parents for that expense. *See id* at 369–70, 105 S.Ct. 1996; *Board of Educ. of Montgomery County v. Brett Y.*, 959 F.Supp. 705, 708 (D.Md.1997), *aff'd*, 155 F.3d 557 (4th Cir.1998) (table). Moreover, the private placement need not be a state-approved facility; the essential question is whether the private placement is proper, that is, whether it confers an educational benefit on the child. *See Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *see also* 34 C.F.R. § 300.403(c) (stating that "a court or a hearing officer may require the agency to reimburse the parents for the cost of ... enrollment [in private school] if the court or hearing officer finds that the agency had not made [a] FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate"). Unilateral private placement is effected at parents' financial

risk, however, if the IEP is later determined by a court to have been appropriate. *See Burlington,* 471 U.S. at 372, 105 S.Ct. 1996.

## III. STANDARD OF REVIEW

■ To examine whether a school board has complied with the IDEA, a court must follow the two step inquiry set forth in *Rowley.* *See* 458 U.S. at 206, 102 S.Ct. 3034. First, the court must determine if "the State complied with the procedures set forth in the Act." *Id.* Second, the court must evaluate whether the "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Id.* at 207, 102 S.Ct. 3034. The burden of proof of establishing a violation of the IDEA falls on the party challenging the administrative findings, *see Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *King v. Board of Educ. of Allegany County,* 999 F.Supp. 750, 766 (D.Md.1998), here the Fritschles. Moreover, in making these inquiries, a court must not "substitute [its] own notions of sound educational policy for those of the school authorities." *Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 999 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998).

■ A federal court must make a bounded independent decision based on the preponderance of the evidence, giving "due weight" to the state proceedings. *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 103 (4th Cir.1991), *aff'd,* 39 F.3d 1176 (4th Cir.1994) (table). If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct. *Id.* If the court chooses not to follow the administrative findings, it must explain its departure. *See Gerstmyer v. Howard County Pub. Sch.,* 850 F.Supp. 361, 364 (D.Md.1994).[13]

## IV. ANALYSIS

■ The Fritschles do not contend that WCBE committed any procedural violations in connection with the 1996–97 school year. Accordingly, I will proceed, under appropriate summary judgment standards, to consider the second prong of the *Rowley* analysis. That is, I must determine whether the Fritschles (who have not sought to supplement the record) have projected sufficiently persuasive evidence that the IEP was not reasonably calculated to provide Drew with an educational benefit that the ALJ's contrary conclusion should be rejected as a matter of law or fact. And, if the public placement was not appropriate, I must then determine, pursuant to *Burlington* and *Carter,* if the private placement is proper.

Having carefully examined the record, I conclude, for the reasons set forth below, that the Fritschles have not genuinely undermined the ALJ's reasoned conclusion that the IEP and Drew's corresponding placement at SDHS were reasonably calculated to provide Drew with an educational benefit. Therefore, it is not necessary for me to evaluate the nature of the private placement.

### A. The IEP's Contents

The Fritschles initially argue that the IEP failed to comply with the IDEA in that it omitted goals and objectives dedicated to reading, which were necessitated by Drew's learning disability, and that it failed to include measurable annual goals.[14]

---

13. Because the matter is pending before me on cross motions for summary judgment, the well-settled principles of summary judgment also apply. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

14. The IDEA requires that an IEP include "(1) a statement of the child's present levels of educational performance; (2) a statement of annual goals, including short-term instructional objectives; (3) a statement of the specific special education and related services to be

To support this contention, the Fritschles offer the report of Dr. Lohnes, the impartial expert appointed by the ALJ. Dr. Lohnes concluded that although the IEP was "not bad," it omitted goals and objectives dedicated to reading. He opined, moreover, that as poor reading skills is one of the main symptoms of Drew's disability, the omission of a reading component to the IEP was significant.

Additionally, Dr. Lohnes strongly questioned the proposed classroom modifications. He stated that the modifications required expansion; that is, WCBE should "provide Drew with one class per day that works on study skills," which should be "coupled with daily small group instruction in all of Drew's academic subjects." Dr. Lohnes further concluded that the "when necessary" qualification of many of the proposed modifications should be eliminated.[15]

In further support of their contention that the IEP's contents were inappropriate, the Fritschles offered the testimony of Diana King, the founder of the Kildonan School and a dyslexia expert. King testified that the IEP was deficient because it did not include objectives or goals for Drew to improve his keyboarding skills, ability to decode words, or any form of language remediation, a tutorial which was critical to Drew's success at Kildonan.

In contrast, WCBE asserts that the IEP's contents were appropriate. First, it maintains that the IEP complies with the IDEA because it does set forth short-term objectives consonant with the achievement of annual goals.[16] Furthermore, WCBE argues that Dr. Lohnes's conclusion that

reading should have been included in the IEP was mistaken because Drew's reading skills were average and did not need to be specifically addressed by the IEP. In addition, WCBE's expert, Dr. Rosner, who visited SDHS and observed various classes there, testified that the IEP was appropriate and that the SDHS faculty "had the intent and willingness to cooperate with the learning disability staff and implement such a program." Tr. at 153. Finally, WCBE relies on the testimony of Michael Shea, who would have been Drew's English teacher, who testified that in the past, he has incorporated all of the proposed modifications listed in Drew's IEP in his own classroom.

## B. Placement at SDHS

In addition to contesting the actual contents of the IEP, the Fritschles also argue that the proposed placement of Drew at SDHS was inappropriate. To this end, they again rely heavily on Dr. Lohnes, who states that Drew "needs small group instruction in his academic classes." For example, Dr. Lohnes concluded that for Drew to receive educational benefit, his special education program must include: "[a]n overall highly structured program which is consistent and predictable; small, highly structured classes in each subject taught . . .; an educational staff which is trained in carrying out the same educational philosophy and methods of instruction in each subject." Because the IEP and proposed placement at SDHS did not include these elements, Dr. Lohnes

provided to the child and the extent that the child will be able to participate in regular education programs; (4) the projected dates for initiation of services and the anticipated duration of the services; and (5) appropriate objective criteria and evaluation procedures for determining, on at least an annual basis, whether the short term objectives are being achieved." 34 C.F.R. § 300.346(a).

15. Dr. Lohnes also doubted how a "regular classroom teacher, with 20 to 30 students in a

class, can appropriately modify his or her program to meet Drew's special education needs."

16. The ALJ did not make a specific finding based on the issue of annual goals, however, based on the administrative record, I find that the IEP sufficiently complied with the IDEA in this regard in that it did provide short term measurable goals.

concluded that the placement was inappropriate.[17]

Additionally, the Fritschles rely on testimony that "it is necessary for Drew to have ample opportunity to be interacting with the teacher because his processing is slower," Tr. at 278, and that the block scheduling program at SDHS, which consists of 90 minute classes, is not good for dyslexic students who "really need to change what they're doing in order to hold their interest." Tr. at 279.

WCBE contends that Drew's placement in SDHS was appropriate and directs my attention to testimony supportive of that contention. Dr. Rosner observed some of the classes at SDHS and concluded that "the classroom teaching [was] extremely interactive, with clear structure and direction being provided for all students." Rosner Report at 2. In addition, Barton testified that the block scheduling program would be beneficial to a dyslexic student. Moreover, Shea testified as to his willingness to implement Drew's IEP in his classroom.

WCBE also argues that placement at SDHS was appropriate because it represented the "least restrictive environment." The IDEA requires that disabled children be placed "to the maximum extent appropriate," in classes with nondisabled children.[18] Mainstreaming is not appropriate, however, if the child would not benefit from being educated in a regular classroom, or when "any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the nonsegregated setting." *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir.1989) (*citing Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983)). Dr. Rosner and Dr. Lohnes agreed that Drew does not require a residential placement such as the Kildonan facility. Accordingly, WCBE argues that SDHS is an appropriate "least restrictive environment" for Drew, whose special education needs are not so severe as to require complete segregation from his nondisabled peers.

## C. The ALJ's Findings

After hearing the testimony from these witnesses, the ALJ concluded that WCBE provided Drew with a FAPE for the 1996–97 school year; that is, she concluded that neither the contents of the IEP nor the placement of Drew at SDHS violated the IDEA. The ALJ discounted Dr. Lohnes's report, in part, as "speculative at best," [19] and conversely, found that the "WCPS staff who testified at the hearing provided a detailed description of how the IEP would be implemented at SDHS." Op. at 28.

Based on my examination of the record before me, this is an extremely close case, one which illustrates the challenge upon the district court in balancing *Rowley's* mandate and the countervailing deference that must be accorded regularly conducted administrative proceedings embodying an evidentiary record, which invariably contain conflicting expert opinion evidence.[20]

---

17. WCBE challenges Dr. Lohnes's conclusions on the ground that he did not observe classes at SDHS or talk to any of Drew's prospective teachers; the ALJ accorded weight to these criticisms.

18. *See* 20 U.S.C. § 1412(5)(B) (states must establish "procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily").

19. Dr. Lohnes failed to observe classes at SDHS despite an opportunity to do so.

20. The challenge lies in applying the "reasonably calculated to provide an educational benefit" standard. The area between a "basic floor of opportunity," and an education that

At all events, the ALJ's ultimate conclusions are reasoned conclusions that indicate that the ALJ made careful credibility determinations, which are supported by the evidentiary record. "Credibility determinations of local level hearing officers—particularly when made during regularly conducted administrative hearings—who themselves have had the benefit of personal observation of the witnesses, are not to be lightly disregarded." *King,* 999 F.Supp. at 770.

Moreover, the ALJ found that the testimony offered by the Fritschles focused "mainly on what the Kildonan School could offer [Drew], and not on what [WCBE] could, or could not, provide." Op. at 31. This critical observation is supported in the record, and it bolsters the soundness of the ALJ's reasoning. It is part of the evidence which is not overcome in the Fritschles' efforts to meet their burden before me to demonstrate that I should reject as unsound the ALJ's findings and conclusions. Mindful that this court must not "reject[ ] reasonable pedagogical choices and disregard[ ] well-supported administrative findings," I am constrained to

sustain the ALJ's finding that WCBE did not violate the IDEA.

In so deciding, however, I note the seeming inconsistency in the ALJ's opinion, which, though troublesome, does not rise to a level of irrationality sufficient to justify rejection of her conclusions and substitution of my own. The ALJ found, simultaneously, that the IEP was appropriate, but that it "would more completely address [Drew's] special education needs if the issues identified .by Dr. Lohnes are incorporated into a revised IEP." Op. at 28. The ALJ does not identify *which* of Dr. Lohnes's "issues" need to be incorporated into the IEP in order to more "completely address" Drew's needs. Although Dr. Lohnes specifically mentions adding a reading component and changing some of the proposed modifications, he most emphatically urged that Drew needs small group instruction in his academic classes and stated that Drew will only receive special education benefit if he is educated by a staff trained in a consistent philosophy of education. If the ALJ's order is read to incorporate these issues, then it *directly contradicts* the IEP and placement at SDHS, which specifies that Drew will remain in classes of 20–30 students.[21]

will "maximize potential" is quite difficult to quantify. *See Rowley,* 458 U.S. at 189, 200, 102 S.Ct. 3034. Nevertheless, "state proceedings must command considerable deference in federal courts." *Hartmann,* 118 F.3d at 1002. "[T]he IDEA does not grant federal courts a license to ... disregard the findings developed in state administrative proceedings," and I am particularly mindful of the Fourth Circuit's admonition that the district court "should not substitute[ ] its own judgment ... for that of local officials." *Id.* at 999, 1000. Here, the ALJ provided detailed reasons for her decision not to rely on King's testimony (that she had no personal knowledge of Drew's academic situation and gave only general testimony) and in discrediting some of Dr. Lohnes's conclusions (that his sweeping statement that most public schools could not modify their program for Drew was speculative).

21. I note also that the ALJ arguably misstated the applicable burden of proof at the administrative level. The burden of proof at the administrative level in IDEA cases has not been explicitly addressed by the Fourth Cir-

cuit or any member of this Court. *See Dove v. Montgomery County,* CCB 96–2379 (D.Md. Nov. 10, 1997) (assuming without deciding that the burden of proof falls on the school board). *But see Lieberman v. Vance,* DKC 97–3002 (D.Md. Sept. 25, 1998) (observing, without discussing, that the ALJ noted that "where, as here, parents have unilaterally placed their child in a private program, the parents must demonstrate that the public school placement was improper under the IDEA").

It is undisputed that the party challenging the administrative decision bears the burden of proof before this court. *See Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991). Accordingly, a determination of who bears the burden of proof at the administrative hearing has significant ramifications, as the losing party will then bear the burden in this court. Although the ALJ's opinion is somewhat unclear, it could be construed to have placed the burden of proof on the Fritschles. *See* Op. at 27 ("[T]o succeed on the first prong of their

The ALJ later states, however, that the WCBE need not address *every one* of Dr. Lohnes' proposed requirements in order to provide Drew with a FAPE. Accordingly, her recommendation that "the IEP can be revised to include the issues discussed in Dr. Lohnes' report" is best interpreted as a call to include Dr. Lohnes's suggestions that the IEP address reading and provide a class to focus on study skills.

On balance, although it is a close call, because the ALJ's conclusions that the IEP and Drew's placement at SDHS would have provided Drew with sufficient access to "specialized instruction and related services," *see Rowley,* 458 U.S. at 201, 102 S.Ct. 3034, to confer upon him an educational benefit have not been seriously called into question by the summary judgment record, I will grant summary judgment in favor of WCBE.

## V. CONCLUSION

For the reasons stated above, judgment shall be entered in favor of WCBE on all counts.

burden, the Parents must show that the IEP developed through the IDEA procedure was 'not reasonably calculated to enable [Drew] to receive educational benefit.' ") (*citing Rowley*).

Many other Circuits have addressed this question and placed the burden of proof at the administrative level on the school district. *See e.g., E.S. v. Independent Sch.* Dist., 135 F.3d 566, 569 (8th Cir.1998) ("At the administrative level, the District clearly had the burden of proving that it had complied with the IDEA"); *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 533 (3d Cir.1995) ("In administrative [ ] proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed"), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996); *Clyde K v. Puyallup Sch. Dist.,* 35 F.3d 1396, 1398 (9th Cir.1994) ("The school clearly had the burden of proving at the administrative hearing that it complied with the IDEA."). Moreover, the ALJ's opinion fails to mention that the IEP must be evaluated at the time of its drafting, not one or two years later. *See Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1040 (3d Cir.1993) ("[T]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.").