William Alex GERSTMYER,

v.

HOWARD COUNTY PUBLIC SCHOOLS, et al.

Civ. No. JFM–93–461.

United States District Court, D. Maryland.

Feb. 2, 1994.

Wayne D. Steedman, Towson, MD, for plaintiff.

Andrew W. Nussbaum, Reichelt, Nussbaum & Brown, Greenbelt, MD, Caroline E.

Emerson, Office of the Attorney General, Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, District Judge.

This action has been brought by William Alex Gerstmyer and his parents under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and related provisions in the Maryland code, §§ 8–401 *et seq.* of the Education Article. He asserts that his right to a free appropriate public education was denied at the beginning of the 1991–92 school year while he was attending the Clemens Crossing Elementary School in Howard County, Maryland. He seeks reimbursement for costs that his parents incurred in hiring a tutor for him while he was attending Clemens Crossing and the tuition costs that they incurred during the remainder of the school year when they took him out of Clemens Crossing and enrolled him at the Montessori School.

In accordance with Maryland law, plaintiffs were granted a "local level due process hearing." The hearing officer ruled against plaintiffs and, after they had filed an appeal, they were afforded a "state level hearing" before a three-member Maryland State Department of Education Hearing Review Board. The Review Board likewise ruled against plaintiffs, and they have brought this action under Section 615(e) of IDEA, 20 U.S.C. § 1415(e).

## I.

Alex was born on May 8, 1985. He began his preschool education in a Montessori program that he attended (at his parents' expense) for three years. During the 1990–91 school year he attended kindergarten at Clemens Crossing in the morning and the Montessori program in the afternoon. In the spring of 1991 Alex's mother approached his teacher at Clemens Crossing to express her concern that "something was missing in Alex." His teacher told her that Alex was doing well, that he was a very bright child, that reading "just hadn't clicked with him yet" and that she should give him more time and not to worry. Approximately three weeks later Alex's teacher at Montessori called his mother about his reading, told her that he was having difficulties in processing and suggested that he be tested.

Immediately thereafter, on May 17, 1991, Mrs. Gerstmyer contacted the Office of Special Education of the Howard County Public Schools ("HCPS") to request an evaluation for Alex. Mrs. Gerstmyer was sent some forms that she filled out and returned immediately. Thereafter, she telephoned the Office of Special Education on three occasions and requested that an appointment be made for Alex to be tested. No appointment was arranged and on her third call Mrs. Gerstmyer was advised that "it was the summertime, we don't test during the summertime, we have a lot of budget cuts, we are unable to do it." She was further advised that the first time that she would be able to have Alex assessed would probably be some time in October. Mrs. Gerstmyer replied that she would not be willing to wait that long and asked for a list of board certified psychologists approved by Howard County. She was told that "they do not give out names."

Mrs. Gerstmyer then went to her pediatrician who recommended that Alex be assessed by Roger Saunders, a psychologist in Baltimore. Mr. Saunders evaluated Alex in July 1991. He determined that Alex is a very bright child (his full-scale I.Q. is 145) and that his problem in learning is due to a learning disability known as "Specific Developmental Dyslexia." (Specific Developmental Dyslexia is a disability included within both the state and federal definitions of specific learning disability.) *See* COMAR 13A.05.01.02B(12)(i); 20 U.S.C. § 1401(a)(1). Mr. Saunders recommended that Alex be taught using the Orton–Gillingham method, a highly-structured phonetic approach to reading and writing.

On August 5, 1991 Mrs. Gerstmyer met with Jacqueline Lazarowitz, the principal of Clemens Crossing. Mrs. Gerstmyer told Ms. Lazarowitz that, upon Mr. Saunders' recommendation, she and her husband were attempting to enroll Alex at the Gemicy School, a private school for children with learning disabilities, but that she anticipated that because of the lateness of the hour she would

be unable to do so.[1] Mrs. Gerstmyer was very upset and Ms. Lazarowitz consoled her, saying that many times children are said to be dyslexic but that their teachers are able to work with them successfully. The Gerstmyers have a daughter a year older than Alex who attends Clemons Crossing and who had had a very successful experience in the first grade taught by Betty Thomas. Mrs. Gerstmyer asked that Alex be placed in Ms. Thomas' class, and Ms. Lazarowitz (although she cannot, of course, formally honor such requests) saw to it that this was accomplished. Ms. Lazarowitz also offered to have Alex tutored by Nancy Otty, the reading specialist at Clemons Crossing, who uses a "whole language" approach, including sight reading, as required by the Howard County curriculum. Mrs. Gerstmyer was grateful for the offer but several days later wrote to Ms. Lazarowitz, saying that she and her husband had decided to have Alex privately tutored by a reading specialist who utilizes the Orton–Gillingham method recommended by Mr. Saunders.

School started on September 3, 1991. The following day Alex would not get out of bed and get dressed, saying that he hated school and would not go. His mother finally succeeded in getting him to school but as soon as she picked him up, he got into the car and reiterated how he hated school. When they arrived at home, Alex told his mother "I'm stupid, I cannot do the work, I do not understand what's going on." According to Mrs. Gerstmyer's testimony, within days Alex "was literally a time bomb when he walked in the door. He would just go from one room to another, depending upon where he happened to be standing when I was saying how was his day. He would clear off a table. He would come in and that was the dumping ground for everything and he would just take it on, just clear off the table. If he were in his room, he would destroy his room. He would strip his bed down to the bedsheets or to the mattress. He was never vindictive, he would never break anything, he was always very careful as to what he would do when he

would destroy something. He would throw paperwork, he would throw the cushions off of the sofa, he would take the books off of the table. This went on day after day." It was at this time that Mrs. Gerstmyer concluded that Alex definitely would have to have tutoring to help him improve his sense of self-worth. The tutoring began the following Monday.

Alex' pattern of behavior continued at home throughout September and October. Understandably, it created almost unbearable tension in the Gerstmyer household. Mrs. Gerstmyer told Ms. Thomas about what was happening but at school Alex remained well behaved. Although his reading skills were not as great as those of some other students, this was not unusual in the first grade where students always are at somewhat different levels. Alex never expressed to Ms. Thomas that he did not want to come to school or that he did not like school. Because of the problems that Mrs. Gerstmyer had described to her, Ms. Thomas told Alex to come to her if things were really bothering him and she told him that if something was upsetting him or he did not feel that he could do some work, he should go to a puzzle table to which she had noticed he was extremely attached.

Federal law requires that an Individualized Education Program ("IEP") be developed for children with disabilities. Federal regulations further require that a meeting to develop an IEP must be held within thirty calendar days of the determination that a child needs special education. 34 C.F.R. § 300.343(c). However, the first meeting to discuss an IEP for Alex was not scheduled until September 25, 1991, when the first Admission, Review and Dismissal ("ARD") meeting for the school year was to be held. Alex' case was briefly discussed, and it was agreed that Ms. Otty would provide additional tutoring for him.[2] School personnel stated, however, that they needed additional testing on Alex to be conducted before devel-

1. The Gerstmyers did contact Gemicy but were successful only in having Alex placed on a waiting list. His name will probably not be reached for two or three years.

2. Alex continued to receive private tutoring as well until some time after he had been enrolled at the Montessori school.

oping an IEP, and a further meeting was scheduled for October 23, 1991.

The additional testing was not done on time and the ARD meeting again had to be postponed and reset for October 30, 1991. On October 28, 1991, Faye Ebron, the resource teacher at Clemons Crossing, did perform additional testing. This testing confirmed what Mr. Saunders' testing had established and resulted in no additional significant information.

The ARD meeting was held on October 30, 1991. It was attended by Mr. and Mrs. Gerstmyer and school personnel. The test results were discussed, and the diagnosis of dyslexia and Alex's eligibility for special education and related services were confirmed. Ms. Ebron was designated to develop the IEP. The committee recommended that Alex begin with resource assistance in reading and writing the following week.

On November 4, 1991 Mrs. Gerstmyer met with Ms. Ebron. In the interim Ms. Ebron had compiled an "IEP" for Alex. The evidence establishes, however, that, in fact, Ms. Ebron had merely assembled portions of IEPs that had been developed for other students and written Alex's name on the top. Although the record further establishes that the general goals of the IEP were appropriate (at least over time), the contents of the plan were not at all specific to Alex.

The following day the Gerstmyers took Alex out of Clemons Crossing and enrolled him at the Montessori school. Alex's attitude toward school and behavior almost immediately changed. Although he continued to have difficulty in reading, he accepted his reading assignments and made progress in his work, particularly with his short vowels. He was taught reading both by his regular Montessori teacher and by a resource teacher (not specifically trained in Montessori methods) at the school. Although neither of the teachers specifically used the Orton–Gillingham method recommended by Mr. Saun-ders, they emphasized phonetics and minimized reliance upon sight words that caused frustration to Alex.

## II.

■ Neither party has requested that I hear any evidence additional to that presented before the local hearing officer and the Hearing Review Board. Accordingly, my task under 20 U.S.C. § 1415(e)(2) is to base my decision on the preponderance of the evidence in the administrative record. The burden of proof rests on the Gerstmyers who are challenging the state administrative decision. *See Barnett v. Fairfax County School Board,* 927 F.2d 146 (4th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Spielberg v. Henrico County Public Schools,* 853 F.2d 256, 258 n. 2 (4th Cir.), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989). The findings of fact made by the hearing officers "are entitled to be considered *prima facia* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Doyle v. Arlington County School Board,* 953 F.2d 100, 103 (4th Cir.1991). If I do not follow those findings of fact, it is incumbent upon me to explain why not. *Id.* at 105.

Here, I do not disagree with any material finding of fact made by the Hearing Review Board (or the local hearing officer whose decision was affirmed by the Hearing Review Board).[3] However, the conclusions that I draw from the facts are different from those reached by the Board.

■ A child is deprived of a free appropriate public education under either of two sets of circumstances: first, if the school system has violated the IDEA's procedural requirements to such an extent that the violations are serious and detrimentally impact upon the child's right to a free public education or, second, if the IEP that is developed by the school is not reasonably calculated to enable

---

**3.** The only specific finding of the Hearing Review Board that I believe is somewhat slightly misstated is the finding in paragraph 15 of its Findings of Fact that "During the time Alex attended first grade at Clemons Crossing Reading Specialist Nancy Ottey worked with Alex for four half hour sessions for a week." It is my understanding that Ms. Otty did not begin working with Alex until after the first ARD meeting held on September 25th. However, if the Board was in error on the point, its error was not material.

the child to receive educational benefits. *See, e.g., Board of Education v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982); *Tice v. Botetourt County School Board,* 908 F.2d 1200 (4th Cir.1990); *Hudson v. Wilson,* 828 F.2d 1059 (4th Cir. 1987).[4] Here, plaintiffs have demonstrated the existence of both sets of circumstances.

■ As stated above, Mrs. Gerstmyer first advised HCPS's Office of Special Education that Alex required an evaluation for a possible learning disability on May 17, 1991. Apparently because of administrative confusion and budgetary constraints, HCPS (after first failing to respond to Mrs. Gerstmyer's inquiries at all) told her that Alex could not be tested until the fall.[5] Faced with this refusal, the Gerstmyers had Alex tested at their own expense. On August 5, 1991, Mrs. Gerstmyer advised the principal of Clemons Crossing of the results of the test. Although federal law requires that a meeting to develop an IEP be held within thirty days of a determination that a child needs special education, it was not until September 25th that a meeting was scheduled to consider Alex's case.

Thus, Alex's first grade year began in a state of complete disarray without special preplanning by HCPS. His first days, weeks and months were disastrous. He became convinced that he was stupid, he had temper tantrums and he developed a hatred for school. When September 25th arrived, HCPS had not yet developed an IEF for Alex and the ARD meeting was postponed so that Ms. Ebron could conduct additional testing. Understandably, the Gerstmyers were upset by this since HCPS had refused to do

the testing in the first instance and since Mr. Saunders' test results appeared fully adequate. In fact, the test results were fully adequate and the additional testing done by Ms. Ebron proved to be superfluous and unnecessary. This was particularly upsetting to the Gerstmyers since the testing had not been performed by October 23rd and required postponement of the second IEP meeting that had been scheduled.

The meeting was finally held on October 30th. However, when Ms. Ebron presented her "IEP" for Alex to Mrs. Gerstmyer four days later it was nothing more than a collection of forms prepared for other students stating only general goals and not at all tailored to Alex's special needs.

■ The following day the Gerstmyers did what any reasonably prudent parent who could afford to do so would do: they withdrew Alex from Clemons Crossing and placed him in a private school where they had reason to believe that he would receive more individualized attention. In taking this action, they were simply vindicating their rights under the IDEA. Of course, every violation of a deadline set by the IDEA or the regulations implementing it does not entitle a parent to obtain a private education for her child. Nor is it wrong for school officials to base an IEP upon IEPs that have been formulated for other students. Here, however, HCPS officials had been notified almost four months before Alex's first grade year was to commence that he needed evaluation for a possible learning disability but almost six months thereafter had failed to

---

4. If a plaintiff is seeking to be reimbursed for the cost of a private education, he must also prove that the education that he received from the private educator was appropriate for his needs. Although the issue was somewhat in doubt at the time that the local hearing officer and the Hearing Review Board rendered their decisions in this case, the Supreme Court has now expressly ruled that it is not necessary that the private school be approved by the state in order to entitle the plaintiff to reimbursement. *See Florence County School District IV v. Carter,* ── U.S. ──, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). Further, although defendants make an ancillary argument that plaintiffs did not prove that the education that Alex received at the Montessori

school was appropriate, the testimony of Alex's teachers at Montessori (Betty Rushing and Sharon Simallis) concerning the content of his curriculum and the testimony of Mr. and Mrs. Gerstmyer concerning the improvement in his attitude toward learning all establish the appropriateness of the education that he received after he was withdrawn from Clemons Crossing.

5. In so advising Mrs. Gerstmyer, HCPS violated COMAR 13.A.05.01.08E.(1)(b) which provides that assessments shall be completed within forty-five calendar days of referral. HCPS conceded this violation and reimbursed the Gerstmyers for the fee charged by Mr. Saunders for testing Alex.

formulate an IEP that was "individualized" in anything but name only.[6]

All of this said, one further comment is in order. This is certainly not a case in which the Gerstmyers were confronted at every juncture by members of an uncaring bureaucracy. To the contrary, the Gerstmyers unhesitatingly testified that Alex's older sister has had an excellent experience at Clemons Crossing and they clearly are appreciative to Ms. Lazarowitz and all of the members of her staff who helped their son. They recognize that Ms. Lazarowitz, Ms. Thomas, Ms. Otty and Ms. Ebron were operating within the limits of budgetary and systemic restraints that caused events to unfold as they did. Indeed, they understand that in a sadly ironic way Alex himself may have contributed to the problem by venting his frustrations at home while hiding them in the classroom in a guise of happiness and good behavior. In the final analysis, however, the good intentions of the personnel of Clemons Crossing are not material. The ultimate fact is that Alex's critical first grade year began without an IEP being in place or ready to be in place and, as a result, he was denied the free appropriate public education to which he was entitled.

A separate order is being entered herewith granting summary judgment on behalf of plaintiffs.

### ORDER

For the reasons stated in the memorandum entered herein, it is, this 2nd day of February 1994

ORDERED

1. Defendants' motion for summary judgment is denied;

2. Plaintiff's motion for summary judgment is granted; and

3. Judgment is entered in favor of plaintiffs against defendants.

---

6. Defendants cite a plethora of cases standing for the proposition that a small violation of IDEA's procedural requirements does not, without evidence of an actual loss of educational opportunity, constitute a failure to provide a child with a free appropriate public education. *Board of Education of Hendrick Hudson Central School District v. Rowley, supra; Hall v. Vance County Board of Education,* 774 F.2d 629 (4th Cir.1985); *Tice, supra; Doe v. Alabama Department of Education,* 915 F.2d 651 (11th Cir.1990); *W.G. v. Board of Trustees of Target Range School District,* 960 F.2d 1479 (9th Cir.1992); *Evans v. School District No. 17 of Douglas County,* 841 F.2d 824 (8th Cir.1988). What distinguishes the present action from all of these cases is that here the record demonstrates that Alex had suffered an actual loss of educational opportunity. Likewise, I am fully cognizant of the sound principle that a court should not second-guess education decisions made by professional educators. I am not doing so here. Rather, I find that a structural flaw in the decision-making process, specifically the inability to convene a meeting to develop an IEP when school was out of session, prevented any decision to be made within a reasonable time frame that Alex's needs required.