### FALMOUTH SCHOOL COMMITTEE, Plaintiff,

v.

### Mr. and Mrs. B., on their own behalf and on behalf of their minor son, P.B., Defendants.

### Civil No. 99–376 P–H.

United States District Court, D. Maine.

July 11, 2000.

---

Amy K. Tchao, Drummond, Woodsum & MacMahon, Portland, ME, for Falmouth School Committee, plaintiff.

Richard L. O'Meara, Murray, Plumb & Murray, Portland, ME, for Mr. & Mrs. B., on their own behalf and on behalf of their minor son, P.B., defendants.

## ORDER ON PLAINTIFF'S MOTION TO BIFURCATE PROCEEDINGS AND MOTIONS TO PERMIT PRESENTATION OF ADDITIONAL EVIDENCE AND FOR LIMITED DISCOVERY AND DEFENDANTS' MOTION TO MODIFY SCHEDULING ORDER AND MOTION FOR LEAVE TO PRESENT ADDITIONAL EVIDENCE

HORNBY, Chief Judge.

The issue here is the standard for disqualifying an adjudicator for lack of impartiality. I conclude that grounds for disqualification do not exist and that requested discovery on the subject is unjustified.

Under the Individuals with Disabilities Education Act ("IDEA"), parents are entitled to "an impartial due process hearing," 20 U.S.C.A. § 1415(f)(1) (West 2000), on the appropriateness of the individualized education program developed for their child.[1] According to United States Department of Education regulations, the hearing officer must not have a "personal or professional interest that would conflict with his or her objectivity in the hearing." 34 C.F.R. § 300.508 (2000). Maine repeats this requirement in its state regulations implementing the federal law. Me. Spec. Ed. Reg. ch. 101, § 13.6(A) (1999).

In this lawsuit, the Falmouth School Committee ("School Committee") has requested judicial review of a state hearing officer's unfavorable administrative decision requiring it to reimburse the defendants Mr. and Mrs. B. for the costs of placing their son, P.B., in private school. The School Committee first asks me to bifurcate the trial and hold an initial proceeding to evaluate its allegation that the hearing officer had a disqualifying personal interest and to allow additional discovery to obtain more information regarding that alleged bias. I conclude that the School Committee has insufficient evidence to support either request and DENY the motions.

## FACTUAL BACKGROUND

The Commissioner of the Maine Department of Education appoints hearing officers for due process hearings. In this case, the hearing occurred in the fall of 1999 and the hearing officer issued her decision on November 16, 1999. It was

---

1. Although the statute speaks in terms of the parents' right, the regulations and caselaw extend the right to all parties. In this case, it is the Falmouth School Committee that asserts the right.

adverse to the School Committee, requiring it to pay the costs of private school for P.B. even though his parents had placed him in private school unilaterally. The School Committee had previously made no objection to the hearing officer hearing the case.

According to the Affidavit of Falmouth's Special Education Director, she first learned on March 8, 2000, that the hearing officer "is in fact a parent of a child with a disability who has placed her son in a private school due to her apparent dissatisfaction with the services her son had been receiving in a public school." Aff. of Elaine Tomaszewski ¶ 12. According to the Special Education Director, the hearing officer never disclosed any potential conflicts of interest. As further evidence of partiality, the Special Education Director reports:

8. Throughout the course of the hearing during a number of breaks in the testimony, I overheard [the hearing officer] making frequent references to her son, what he was doing that day, daily child care issues with respect to him, and his education, to anyone who happened to be in the hearing room at the time.

9. On the first day of the hearing before the hearing began, [the hearing officer] commented to me that she had left her 11–year–old son alone at home that day and had instructed him to check in by phone regularly throughout the course of the day. As the day went on, [the hearing officer] seemed to be distracted by her own child care issues, as evidenced by her openly sharing with those in the room (which at times included the parents in this case, Defendants Mr. and Mrs. B) her own reports of her son's compliance with her instructions to him during breaks in the hearing.

10. At one point during a break in the testimony at the hearing, I walked into the hearing room and overheard [the hearing officer] discussing her own decision to place her son in a private school with the parents in this case, Mr. and Mrs. B. Specifically, I heard [the hearing officer] tell Mr. and Mrs. B that she had talked to the boy's father about placing her son in a private school, that she felt her son really needed the private school because of the "academics," that he would probably attend "through the ninth grade," and that "it gets complicated . . . the whole middle school thing."

11. On several occasions at the hearing I observed [the hearing officer] well up with tears during the testimony of both Mr. and Mrs. B regarding their son's and family's emotional difficulties. On one of those occasions during an emotional moment in the testimony of Mrs. B, [the hearing officer] appeared to have tears in her eyes and had to call for a break.

Aff. of Elaine Tomaszewski ¶¶ 8–11.

Affidavits also reveal that the School Committee Chair wrote to the hearing officer on December 10, 1999, requesting details about the hearing officer's child's schooling and about *ex parte* communications with Mr. and Mrs. B. about the hearing officer's child's or their child's educational placement. The letter was not answered. On February 7, 2000, the School Committee Chair wrote to the Commissioner of the Maine Department of Education to request answers. This letter, too, went unanswered. The School Committee's lawyer followed up with a letter of March 7, 2000. In the meantime, the School Committee had requested another hearing on the subject of the family's failure to cooperate fully with the further evaluations of P.B. needed to develop a transition plan for his re-entry into public school. Following its custom, the Department of Education appointed the same hearing officer, but in the written appointment of February 23, 2000, explicitly recognized the conflict of interest challenge. The Department directed the hearing officer to make a determination of the conflict of interest charge (if the School Committee

pursued it) on the record with a court reporter. A pre-hearing occurred on March 8, 2000; the School Committee pursued its challenge, and the hearing officer rejected it. On March 13, 2000, the Due Process Coordinator of the Maine Department of Education wrote the School Committee's lawyer that what happened at the March 8 pre-hearing "adequately addressed the concerns." [2]

At the March 8 pre-hearing, after listening to the School Committee's challenge, the hearing officer responded:

I will disclose personal information about my family situation. I am the parent of an 11 year old son. My son has moderate hearing loss. He attended public schools both in California and in Maine through the third grade. Last summer we moved to the mid-coast area and I enrolled him in a private school based purely on the fact that he is quite artistic and musical and so on. And through no fault of their own, but rather through a decade of financial constraints, I felt that the public schools were unable to provide the sort of arts education I thought that he would enjoy. I have had always perfectly wonderful relationships with various school districts. In this state it was Augusta and in California there were two school districts. I've never had a contested PET meeting. [3] I've never filed for mediation or due process hearings. My son continues to receive speech and language services once a week. I transport him and that is out of SAD 50 in Thomaston. I also am not—do not recall ever having

any ex parte communications with Mr. and Mrs. [B.] regarding anything that would impact—first of all, any communication I have had with Mr. and Mrs. [B.] have been in the hearing officer—in the hearing room, always in the presence of [Mr. and Mrs. B's lawyer], and typically in the presence of either yourself, [the School Committee lawyer], or [the Falmouth Special Education Director] or one of your witnesses as well as the court reporter. So I am here saying I have no recollection whatsoever of having ex parte communications with [Mr./ Mrs. B.] on any topic that would impact on my ability to be neutral in this hearing. Therefore I am—and I must state, that I gave this a lot of thought and had extensive conversations with the department, and have decided not to recuse myself in this matter.

March 8, 2000 Tr. p. 8, line 13 to p. 10, line 2.

## DISCUSSION

Cases like this are difficult for all concerned. Probably nothing is worse for a lawyer and client than to lose a case and then come to believe that the deck was stacked against them from the start because the adjudicator had a conflict of interest or bias. The situation is compounded by the difficulty of obtaining information. No lawyer wants to "cross examine" an adjudicator on what may turn out to be a losing argument, and then have that adjudicator proceed to resolve the case. The client's suspicion will be that any hostility is only increased.

---

2. Earlier communication might have allayed some of the School Committee's concern that it was simply being ignored. The hearing officer apparently consulted the Maine Attorney General's office and was told that she should not respond to the School Committee's "interrogatories." Mot. for Recusal Hr'g Tr. at 7, line 5, Falmouth School Committee v. B., Case No. 00.051 (Mar. 8, 2000) (hereafter "March 8, 2000 Tr."). A letter so informing the School Committee would have helped. Likewise, a response to the Chair's letter to the Commissioner—if only to say that legal advice was being sought—would have been a

step. Finally, according to the March 8 transcript, the hearing officer was given to understand from the Department that it had answered the School Committee's letter. In fact, it had not, and did not, until after the hearing.

3. "PET" stands for the Pupil Evaluation Team, which is responsible for determining a student's eligibility for special education and supportive services. Me. Spec. Ed. Reg. ch. 101, § 8.1 (1999).

At the same time, there are powerful institutional interests in making post-decision challenges to an adjudicator the exception and not the rule. Each losing party searches for every possible reason to attack a negative decision, and issues that were insignificant or evanescent before the decision suddenly and unfairly (to the other party and the adjudicator) become monumental. An "appellate" tribunal is seldom in a good position to make the necessary factual determination. Discovery presents its own dangers. Unless a very high standard is set for any disgruntled litigant to be able to question an adjudicator about his/her personal affairs, fishing expeditions on the subject will be inevitable.

■ There is little precedent for how a federal district court should resolve a challenge like this to an administrative hearing officer. I therefore turn to the practice of appellate courts in reviewing recusal issues involving federal district judges under 28 U.S.C.A. § 455 (West 1993) for an analogy. There, the responsibility is on the party seeking recusal to develop the factual record before the trial judge. *See, e.g., Pontarelli v. Stone*, 978 F.2d 773, 775 (1st Cir.1992); *In re United States*, 666 F.2d 690, 695 (1st Cir.1981). Analogously, the proper forum to develop facts relating to disqualification of a hearing officer in an IDEA case is on the record before the hearing officer. Indeed, that is what the Maine regulations require:

> The appointment of the hearing officer may only be challenged on the grounds of conflict of interest or bias. Upon the filing in good faith by a party of a timely charge of conflict of interest or bias, requesting that the hearing officer disqualify himself/herself, the hearing officer shall determine the matter as part of the record.

Me. Spec. Ed. Reg. ch. 101, § 13.6(B) (1999). I do not believe that the statutory authority of the district court to "hear additional evidence at the request of a party," 20 U.S.C.A. § 1415(i)(2)(B)(ii), contradicts this regulation or the policy on which it is based. *Compare Grant v. Shalala*, 989 F.2d 1332 (3d Cir.1993) (in Social Security Disability cases, remand to the Social Security Administration for determination of Administrative Law Judge bias is required); *Hummel v. Heckler*, 736 F.2d 91 (3d Cir.1984). Here, therefore, assuming that the challenge to the hearing officer was timely,[4] the ordinary course would be to send the case back to the hearing officer to develop the record on the disqualification issue. In this case, however, the opportunity to develop the record occurred at the March 8, 2000 pre-hearing and I have the record of that proceeding. Nothing is to be gained by a remand.

■ What, then, is the evidence for disqualification? First, unlike the standard for federal judges under 28 U.S.C.A. § 455(a) (West 1993), "appearance" of impartiality is insufficient. A conflict of interest or actual bias, hostility or prejudgment is required. *Roland M. v. Concord School Comm.*, 910 F.2d 983, 997–98 (1st Cir.1990). *Accord Dell v. Board of Educ.*, 32 F.3d 1053, 1064–66 (7th Cir.1994).

---

4. The timeliness issue is a close one. *See Marcus v. Director, Office of Workers' Compensation Programs, U.S. Dep't of Labor*, 548 F.2d 1044, 1051 (D.C.Cir.1976) ("general rule governing disqualification, normally applicable to the federal judiciary and administrative agencies alike, ... requires that such a claim be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist"); *Delesdernier v. Porterie*, 666 F.2d 116, 122–23 & nn. 3–4 (5th Cir.1982) (same). The affidavits are unclear on whether the School Committee knew earlier that the hearing officer had a child with special education needs. They are clear that information about the child's placement was not gained until March 8, 2000, presumably at the pre-hearing. But the School Committee bases its charge of partiality partly on the hearing officer's conduct at the November hearings. Because both state regulations and sound public policy require that a person challenge the appointment of a hearing officer only in good faith, Me. Spec. Educ. Reg. ch. 101, § 13.6(B) (1999), I conclude that the School Committee was justified in delaying its challenge until it had more concrete information and therefore find the challenge timely.

Here, the record reveals that the hearing officer has a child with moderate hearing loss in private school and that she has no past or pending disagreements with her public school districts over placement or reimbursement. The School Committee hypothesizes that at some point in the future she may have a disagreement and that her decision in this case would be a useful precedent. That is too attenuated to amount to a conflict of interest or actual bias, hostility or prejudgment. The other factors are even less persuasive. Having a child with a disability is not alone disqualifying, as the School Committee appropriately concedes. *See* Pl.'s Mot. to Permit Presentation of Additional Evidence and for Limited Disc. at 11 n. 7; *Independent School Dist. No. 283 v. S.D.*, 948 F.Supp. 860, 877 n. 26 (D.Minn.1995) ("We find no basis to believe that such a parental responsibility would impact, favorably or unfavorably, upon the capacity of [a hearing officer] to responsibly and impartially rule upon the propriety of an educational program for a handicapped child"). The hearing officer's tears during some of the testimony reveals only that she is a human being with emotions. Every judge has had the same experience, and a reading of the sealed record here about this child makes abundantly clear why such a reaction might occur. The alleged *ex parte* conversation was only about the hearing officer's own child (indeed, it is unclear that anyone at the time knew that the child had any special education issues) and, although in retrospect it has created an issue, appears at the time to have been only passing social conversation.[5]

I recognize that the School Committee has assiduously stayed with the facts available to it and has attempted to observe all the proprieties in this difficult task of challenging the adjudicator. I also realize that its lawyer believes that her and her client's fears can only be put to rest by testimony under oath from the hearing officer and compelled record production concerning her son. But there is simply not enough here to justify that kind of discovery intrusion into the independence of the adjudicator. *See El Fenix de Puerto Rico v. The M/Y JOHANNY*, 36 F.3d 136, 141 n. 5 (1st Cir.1994) (conflicting authority on appropriateness of discovery under 28 U.S.C. § 455); *Ricci v. Key Bancshares of Maine*, 111 F.R.D. 369, 373 n. 4 (D.Me.1986) (discovery not appropriate in section 455(a) case).[6] The time to develop the record further (if indeed there was any more to develop) was at the hearing on March 8, 2000. That was the time for further factual assertions (if they could be supported) or for further questions posed to the hear-

5. I must correct any intimation by the hearing officer that it was not *ex parte* if the parents' lawyer was present. *"Ex parte"* means meeting separately with only one side of the controversy. This was, therefore, an *ex parte* conversation as described by the Special Education Director. *Ex parte* conversations are forbidden, however, only on the subject of the controversy. Adjudicators are not required to be mute when one side enters the hearing room before the other. Clearly, however, even social conversation must be chosen with care because of the opportunity for misunderstanding.

6. The Third Circuit has allowed discovery in Social Security Disability appeals, *see Hummel v. Heckler*, 736 F.2d 91 (3d Cir.1984), but only in the narrow context "where information relating to a contention bearing on the fundamental fairness of the agency hearing is in the possession of the government." 736 F.2d at 95. The issue in *Hummel* was whether the Administrative Law Judge had been subjected to a so-called "Bellmon Review," allegedly a statistical review to ensure that the Administrative Law Judge was denying benefits in a sufficiently high percentage of cases. In a later case, the Third Circuit disapproved more wide ranging discovery:

Our decision in *Hummel* did not approve discovery of the type permitted here. In *Hummel*, we held that a claimant was entitled to discovery as to whether the ALJ had undergone a "Bellmon Review" and, if so, the nature of the review. 736 F.2d at 95. We did not sanction depositions of the ALJ's coworkers and staff.

*Grant v. Shalala*, 989 F.2d 1332, 1345 n. 17 (3d Cir.1993). The court went on to describe how this broader discovery "would pose a substantial threat to the administrative process." *Id.* at 1345.

ing officer following her own statement. (I do not mean to minimize how difficult a task that is for a lawyer.)

## CONCLUSION

On this record, there is not enough to support discovery on the disqualification issue or to find that disqualification should have occurred. The School Committee's motions to bifurcate the proceedings and for additional discovery are **DENIED.**

On the merits of the appeal, the parties have both filed motions to supplement the record with evidence about events occurring after the hearing officer's decision. Although the parents at first resisted the School Committee's motions, they now appear to agree with part of it.

I am terminating the motions without action. First, I can no longer tell what is disputed—the parents' most recent filing leaves me in doubt as to the parties' respective positions on additional evidence. Second, I believe that a face-to-face conference between the lawyers over what should be added, if anything, to the record, reserving argument over relevance, would be a better use of their time. From the legal arguments it is hard for me to tell why any of it would be particularly helpful given the issue posed in this lawsuit, but then again I do not really know the contents of this new evidence. Therefore, the lawyers shall meet and confer and report to the court by July 25, what they agree on and what they disagree on concerning supplementation.

The Clerk's Office shall then schedule a conference of counsel (by telephone or in person) with the Magistrate Judge or with me to set final scheduling orders on the merits of the case.

**SO ORDERED.**