**Christopher WALLER, etc., Plaintiff**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al., Defendants**

**No. CIV. AMD 01–3627.**

United States District Court, D. Maryland.

Nov. 20, 2002.

532

Julie Ann Starbuck, Holly Lynn Parker, Parker and Starbuck PC, Kensington, MD, for Plaintiff.

Andrew W. Nussbaum, Roger Cole Thomas, Knight Manzi Nussbaum and La-Placa PA, Upper Marlboro, MD, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

This action was brought by Janis Pace in her own right and on behalf of her son,

Christopher Waller, pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA"), against defendants, the Board of Education of Prince George's County, Maryland, and its Superintendent, Iris Metts, who is sued in her official capacity only (together, "defendants").[1] Pace alleges, in essence, that defendants failed to provide Christopher with a "free appropriate public education" ("FAPE") as required by the IDEA, 20 U.S.C. § 1400(d)(1)(A), for the 1999–2000 and 2000–2001 school years, and that therefore she, acting unilaterally, justifiably enrolled Christopher in a private school, the costs for which she herein seeks reimbursement. Now pending is the defendants' motion for summary judgment. No hearing is needed. For the reasons set forth herein, the motion for summary judgment shall be granted.

## I. Background

Christopher was born in 1987. He has been identified as having a Specific Learning Disability ("SLD") with a secondary Speech/Language disability ("S/L"). Prior to October 1999, Christopher was enrolled in the Shaker Heights, Ohio, Public Schools ("SHPS"), and his education in Ohio was directed by an Individualized Education Program ("IEP") developed there. The family moved to Maryland in 1999 and Pace enrolled Christopher in the Prince George's County Public School System in October 1999 as a sixth grade student at the Rose Valley Elementary School ("Rose Valley").

The IEP prepared by SHPS had been developed at a periodic review IEP team meeting held in that jurisdiction on June 3,

1999, and was signed by all participants, including Pace. The SHPS IEP noted that Christopher has a specific learning disability, but directed that he was to participate in the regular education classroom for Social Studies, Science, Computer, Physical Education, Art, and Music. At SHPS, Christopher was educated in a SLD room for Math and Language Arts classes. Modifications to the regular classroom routine listed in the SHPS IEP were: (1) extended time to prepare assignments and tests; (2) small group learning sessions; (3) use of a calculator and computer; and (4) oral presentation of instructions.

Regrettably, when Pace enrolled Christopher in school in October 1999 in Prince George's County, she mistakenly provided defendants with the IEP that had been prepared by SHPS for the *1998–1999* school year rather than the then current IEP. Although Pace testified before the Administrative Law Judge ("ALJ") that she promptly provided defendants with the current IEP, the ALJ found that she did not and that, in fact, defendants provided Pace with release forms and requested up-to-date documentation directly from SHPS. In the meantime, Christopher was placed in a co-taught special education class, i.e., a class being co-taught by a regular teacher and a special education teacher, and defendants immediately began to implement the goals and objectives included in the IEP presented by Pace. The current IEP was soon obtained, apparently in November 1999. Christopher received speech and language services on a "pull out" basis. (In October 1999, there were self-contained special education classrooms in use at Rose Valley, but only for those students whose disabilities were so

---

1. The complaint includes six counts, most of which allege violations of plaintiff's rights under "the IDEA, § 504 [of the Rehabilitation Act of 1973], [42 U.S.C. § ] 1983, and Maryland law." Of course, this has unfortunately become the standard of pleading in IDEA cases, but the parties' memoranda on the issues make clear that they understand that this is an IDEA case, plain and simple.

severe as to require that they be educated in a separate area for the full school day, and have no interaction or contact with the students in the regular education program. There were no self-contained classrooms in use for a single subject.) In sum, during the 1999–2000 school year at Rose Valley, Christopher was taught in a regular classroom environment that employed the co-teaching model. He received speech and language services in the regular classroom setting, but also on occasion received speech and language services on a pull-out basis in the Resource Room.

There is substantial evidence in the record, and the ALJ specifically found, that Christopher made substantial educational progress during the one school year he was enrolled in the Prince George's County school system. For example, he was the overall sixth grade winner in a "Write–A–Book" writing contest in which the *entire student body* at Rose Valley participated. (Pace admits that while she assisted Christopher, the work product was his own.) Furthermore, Christopher took the Maryland Functional Math and Reading Tests in the Fall of 1999 shortly after he enrolled. The minimum passing score is 340. Chris did not do very well on his first completion of those tests, scoring 307 and 340, respectively, on the reading and math tests. He again took the tests in the Spring of 2000, with the accommodations provided in the IEP. In his second completion of the tests, he scored 368 and 358, respectively. Finally, Christopher's grades at Rose Valley for sixth grade during the 1999–2000 school year increased steadily, and he received a passing grade in all subjects in all marking periods.

The IEP developed for Christopher for the 2000–2001 school year was developed at a properly scheduled IEP meeting held on June 6, 2000. The IEP team considered all of the evaluations of Christopher that had been performed, including those of the defendants as well as the outside evaluations obtained by Pace. Pace actively participated in the meeting, and she offered suggestions, some of which were incorporated in the goals and objectives contained in the proposed IEP. The IEP resulting from the June 6, 2000, meeting continued the goals and objectives set forth in the 1999–2000 IEP and it called for Christopher to receive 7.5 hours of special education services per week in the area of language arts. The proposed IEP was silent as to mathematics and reading goals, as Christopher's performance and grades during 1999–2000, in the judgment of school staff, did not indicate that he had particular needs in those areas.

In fact, Pace had applied for admission of Christopher to the private Chelsea School in February 2000, and she was notified by letter dated May 26, 2000, more than a week before the June 6, 2000, IEP meeting, that Chris had been accepted as a seventh grade student effective in the Fall of 2000. The ALJ found that Pace's testimony that she participated in the June 6, 2000, IEP meeting in good faith lacked credibility.

## II. The Decision of the Administrative Law Judge

The hearing before an ALJ was held over several days between January 16, 2001, and April 2, 2001. The ALJ issued his 25 page opinion on May 31, 2001, finding and concluding that Christopher received a "free and appropriate public education" during the 1999–2000 school year and that the IEP prepared by defendants for implementation during the 2000–2001 school year was "reasonably calculated to provide [Christopher] with a free and appropriate public education." Accordingly, he denied Pace's request for reimbursement.

### III. The Statute

The procedural and substantive purposes of IDEA are well-settled. I have stated:

> The IDEA was drafted to "assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." The "centerpiece" of this "free appropriate public education" is the individualized education program ("IEP") which is a collaboratively developed plan for a disabled child's education. "The IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used." This written plan must be appropriately reviewed and revised.
>
> The IDEA mandates that all disabled children are entitled to a FAPE. The Supreme Court has not set forth a precise formula for determining what constitutes a FAPE. More generally, it has stated that the child must receive "access to specialized instruction and related services that are individually designed to provide educational benefit." Moreover, although a school system is not required to maximize a child's potential ... it is imperative that the educational placement "be likely to produce progress, not regression or trivial educational advance."

*Cavanagh v. Grasmick,* 75 F.Supp.2d 446, 456–57 (D.Md.1999) (citations omitted).

██ Under the IDEA, the district court is required to conduct a *de novo* review of the administrative record while giving "due weight" to the administrative findings made below. *See Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 103 (4th Cir.1991), *aff'd* 39 F.3d 1176 (4th Cir. 1994). In reviewing IDEA cases, a court must not "substitute [its] own notions of sound educational policy for those of the school authorities." *Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 999 (4th Cir.1997), *cert. denied,* 522 U.S. 1046, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998). Rather, as noted above, a federal district court must make a bounded independent decision based on the preponderance of the evidence, giving "due weight" to the state proceedings. *See Doyle,* 953 F.2d at 103. If the administrative findings "were made in a regular manner and have evidentiary support," they are to be considered *prima facie* correct. *See id.* at 105. If the court chooses not to follow the administrative findings, it must explain its departure. *See Gerstmyer v. Howard County Pub. Sch.,* 850 F.Supp. 361, 364 (D.Md.1994).

These principles and standards govern my review of the record here.

### IV. Analysis

#### A. The Request for Discovery on the Illness of the ALJ

Pace makes an odd request that because the ALJ was ill (and was apparently hospitalized for a time) and therefore failed to issue his opinion in this case by the May 2, 2001, agreed due date (issuing it, instead, 29 days late on May 31, 2001), she should be permitted to take discovery "in order to determine the manner in which this decision was actually rendered and by whom." *See* Pl's. Opp. at 3. This remarkable suggestion, that the decision of the ALJ is not his own impartial and reasoned opinion and decision, is unfounded and ill-becomes the reputation of Pace's otherwise responsible counsel. *Cf. Falmouth School Committee v. Mr. and Mrs. B,* 106 F.Supp.2d 69 (D.Me.2000)(refusing to permit party to

obtain information regarding alleged ALJ bias). It will not be further considered.

### B. ALJ Procedural Errors

Pace alleges the ALJ erred when he: (1) failed to discuss the testimony of Pace's expert witness; and (2) placed the burden of proof on Pace to show that the 2000–2001 IEP would not deliver a FAPE to Christopher. These alleged errors do not entitle Pace to relief.

#### 1. The Expert Testimony

Pace contends that the ALJ did not consider the testimony of Dr. Ruth Spodak, a psychologist who provided a psychoeducational evaluation of Christopher. Dr. Spodak testified that the IEP developed for the 2000–2001 school year was seriously deficient, and was missing goals in reading and math. Dr. Spodak also concluded that "there are many things that are missing from this IEP, and regardless of the setting, if this were all that was being provided, I don't believe he would be successful."

■ The failure of the ALJ to discuss Dr. Spodak's negative evaluation of the proposed IEP is scant reason to upset the ALJ's decision. What the Fourth Circuit recently reiterated about courts applies equally to ALJs:

> [O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals. Indeed we should not disturb an IEP simply because we disagree with its content, and we are obliged to defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides.

*MM v. School Dist. of Greenville Co.,* 303 F.3d 523, 532 (4th Cir.2002); *see also Cavanagh,* 75 F.Supp.2d at 476 (citations omitted) (finding the ALJ's reliance on a teacher's testimony to support the conclusion that the child received educational benefit at the public school was not error).

An IEP meeting was held on June 6, 2000. Pace actively participated. The team considered evaluations of both the school staff and educational experts, including those by Dr. Spodak. The IEP developed for the 2000–2001 school year continues the goals and objectives set forth in the 1999–2000 IEP (**which meets the IDEA's FAPE standard,** *see infra* **at section IV.D**). The 2000–2001 IEP calls for Christopher to receive 7.5 hours of special education services per week in the area of language arts. It is silent as to mathematics and reading goals as the defendants' educational professional determined that the Christopher's performance and grades did not indicate particular needs in those areas. The IEP team followed the IDEA procedures to develop an IEP that builds upon the prior IEP, using the input of experts, teachers and, most importantly, of Pace.

It is clear that the ALJ was fully aware of Dr. Spodak's negative view of the IEP; it is equally clear that the ALJ simply discounted that negative view as far outweighed by the education professionals who testified on behalf of the defendants. I perceive no reason why I should not defer to the educators' decisions, and the credibility determinations and evidentiary weight assigned to the record by the ALJ, who had the benefit of personally observing Dr. Spodak's testimony. Accordingly, the ALJ's decision to accord Dr. Spodak's testimony little weight (or any discussion in his reasoning) in his evaluation of the work of the IEP team does not generate a genuine issue of material fact sufficient to upset the presumptively correct determination of the ALJ.

## 2. Burden of Proof

The ALJ placed the burden of proof on Pace, declaring that Pace must demonstrate that the 2000–2001 IEP offered by defendants was not reasonably calculated to enable Christopher to receive educational benefit. He reasoned, in part, that as the 2000–2001 IEP was simply an elaboration upon the existing, 1999–2000 IEP, which Pace had endorsed when it was formulated in Ohio, she should bear the risk of non-persuasion.

■ There is no clear statutory authority for assigning the burden of proof; this question is an unsettled one in this district. *See, e.g., Fritschle v. Andes,* 45 F.Supp.2d 500, 508 (D.Md.1999) (discussing the conflict in authority); *Brian S. v. Vance,* 86 F.Supp.2d 538, 545 (D.Md.2000), *vacated and remanded sub nom. Schaffer v. Vance,* 2 Fed.Appx. 232, 2001 WL 22920 (4th Cir.2001); *Steinberg v. Weast,* 132 F.Supp.2d 343 (D.Md.2001). In any event, although the ALJ placed the burden of proof on Pace, he added that "while the parties seemed to place great emphasis on the issue of burden of proof, my decision would remain unchanged even if I had determined that the PGPS carried the burden." *See* ALJ's Decision at 13; *see also Steinberg,* 132 F.Supp.2d at 347. There is no reason whatsoever to doubt that defendants would have prevailed even if they were deemed to have the burden of proof. Accordingly, the fact that the ALJ placed the burden of proof on Pace does not generate a genuine issue of material fact sufficient to upset the ALJ's presumptively correct determination of whether defendants complied with the IDEA.

## C. Procedural Violations of the Statute by Defendants

Pace argues that defendants did not timely and appropriately follow the procedures required by the IDEA when Christopher first enrolled in school as an out-of-state transfer student. Although the IDEA is silent on what procedures apply when a student transfers from another state, the United States Office of Special Education and Rehabilitative Services in the Department of Education ("OSEP"), the agency principally responsible for administering the IDEA, has issued a policy memorandum to provide guidance to states and school districts in such matters. *See* OSEP Policy Memorandum 96–5 (hereinafter "OSEP Memorandum"), reprinted in 24 Indiv. Disabil. Educ. L. Rptr. 320 (U.S. Dep't Educ. Dec. 6, 1995); *see Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.,* 202 F.3d 642, 649 (3rd. Cir. 2000); *Bailey v. Sullivan,* 885 F.2d 52, 62 (3d Cir.1989) (en banc). The Fourth Circuit has held that agency interpretations that are contained in opinion letters "are entitled to respect … but only to the extent that those interpretations have the power to persuade." *Miller v. AT & T Corp.,* 250 F.3d 820, 832 (4th Cir.2001), quoting *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (internal quotation marks omitted).

■ Pace argues that defendants did not timely and appropriately follow the procedures required by the IDEA, alleging that they: (1) wrongly implemented the 1998–1999 IEP; (2) failed to find that the IEP met their own or IDEA requirements, or that it had Pace's approval; and (3) failed to make a timely request for Christopher's records from his previous school. These contentions lack merit.

## 1. Implementing the 1998–1999 IEP

Pace argues that defendants wrongly implemented the first IEP they received because it was the IEP from 1998–1999 used during Christopher's fifth grade year. The OSEP Memorandum provides, howev-

er, that "under [the IDEA], the [successor] school district *is not required* to adopt the most recent evaluation and implement the most recent individualized education program (IEP) developed for the disabled student by the [predecessor] school district." *Id.* (emphasis added). The OSEP Memorandum further states that "[the successor state] and its responsible school district must ensure that the rights of the disabled student and his or her parents are not compromised when an interstate transfer occurs." *Id.* Defendants received the 1998–1999 IEP from Pace in October 1999 and they immediately thereafter provided Pace with release forms, requested current documentation from SHPS, and soon received the current IEP. Furthermore, in the meantime, defendants began to implement the 1998–1999 IEP. It is clear that defendants acted responsibly in both promptly implementing the 1998–1999 IEP upon receipt, and in taking prompt steps to obtain the current IEP to ensure that Christopher's and Pace's rights were not compromised in consequence of the interstate school transfer. The OSEP Memorandum unambiguously states that the IDEA does not require a successor school system to apply the most recent IEP upon an interstate transfer. Accordingly, defendants did not wrongly implement the first IEP it received.

### 2. Meeting Local, IDEA, and Pace's Requirements

Pace argues that defendants violated the requirements of the OSEP Memorandum when they failed to determine whether the 1999–2000 IEP met their own and IDEA requirements, or whether Pace was satisfied with the IEP.[2] These contentions are unavailing.

The IDEA contemplates that "the IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used." *Cavanagh,* 75 F.Supp.2d at 456 (quoting *Sanger v. Montgomery County Bd. of Educ.,* 916 F.Supp. 518, 519 (D.Md.1996)). The regulations governing the IDEA state that the public agency must hold an IEP meeting to determine the child's IEP, and IEP meetings must include the parents of the child. 34 C.F.R. § 300.344(a)(1). Regarding transferring students, however, the OSEP Memorandum states:

> [t]he school district in State B also could elect to implement the most recent IEP developed by State A's school district provided that it determines that this IEP meets [IDEA] requirements and State B's education standards. The school district in State B would not be required to conduct another IEP meeting if a copy of the current IEP is available, the parents indicate that they are satisfied with that IEP, and the school district in State B believes that the IEP is appropriate for the student and that it can implement that IEP.

OSEP Memorandum 96–5. Defendants indicated that in November 1999, they deter-

---

**2.** "When a student moves from a school district in State A to a school district in State B, the State B school district first must ascertain whether it will adopt the most recent evaluation and IEP developed for the student by the State A school district .... [T]he state B school district must determine, as an initial matter, whether ... the most recent evaluation of the student conducted by the school district in State A and the State A school district's IEP meet the requirements of [the IDEA] as well as the education standards of State B. If the State B school district accepts State A's determination ... and adopts the State A school district's evaluation, the school district in State B must provide notice to the student's parents in accordance with 34 CFR § 300.504(a)." OSEP Memorandum 96–5.

mined that the goals for the 1999–2000 IEP were curriculum-based, and when looking at their own program goals along with the IEP goals, they did not recognize much of a problem. *See, e.g.*, Transcript at 24, Testimony of DeTurris.

Furthermore, although there was no formal conference, defendants' school staff stated that they discussed the IEP with Pace, and specifically its goals, objectives, and accommodations. *Id.* at 23. Although Pace denied having any such conversations or meetings to discuss implementation of the 1999–2000 IEP, the ALJ permissibly declined to credit her testimony.

■■■ It must be recalled that "under the IDEA, ... [when] a procedural defect exists, [the court is] obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." *MM*, 303 F.3d at 533, *citing Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir.1997) ("To the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education."). "If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations." *Id.* at 533–34, *citing Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir.1990) ("[The child] has benefitted educationally from the instruction provided under the Board's IEP. Federal law requires no more.") (internal citation omitted).

It is undisputed, moreover, that Pace approved the IEP when SHPS created it in June 1999. Furthermore, Pace was present at school several days a week throughout the 1999–2000 school year to observe Christopher and his teachers. Her regular presence would have given her an ample opportunity to note and report any disagreements she may have had with the defendants' implementation of the IEP. Accordingly, even assuming that some procedural defect lurks within the instant record, the record does not support the conclusion that Christopher has suffered the loss of an educational opportunity; rather, what presents itself is a technical procedural violation of the IDEA.

### 3. Belated Request for Records

Pace alleges that defendants did not timely request Christopher's records from Ohio. She relies on a May 17, 2000, memorandum as an example of defendants' alleged practice of delayed requests. The memorandum states that it is imperative that records of a student with a disability be transferred in a timely manner, that the receiving school must immediately request the student's records from the previously attended school, and the new school must immediately implement an IEP upon receipt. As discussed above, however, defendants received the 1998–1999 IEP from Pace in October 1999 and immediately provided Pace with release forms, requested current documentation from SHPS, and soon received the current IEP. The record simply does not support the contention that defendants failed to make a timely request for Christopher's records. Rather, if anything, defendants responsibly followed the policies set out in the May 2000 memorandum even before it was issued.

For all of these reasons, the record does not support the claim that defendants committed prejudicial procedural violations of the IDEA.

### D. Substantive Sufficiency of the IEPs

■■■ Pace makes two substantive complaints. First, she alleges that the IEP

developed by defendants for the 2000–2001 school year was substantively inappropriate. The only evidence she points to, however, is Dr. Spodak's testimony. On the other hand, defendants presented the ALJ with ample evidence to show the IEP developed for 2000–2001 would provide a FAPE and was reasonably calculated to provide Christopher with an educational benefit. In view of the deference owed to the administrative findings, the ALJ's conclusions in these regards are unassailable.

Second, Pace alleges that defendants failed to provide Christopher with a FAPE during the 1999–2000 school year. To be sure, the instructional and special education services provided to a disabled student must provide more than trivial or *de minimis* benefits, and must be "likely to produce progress, not regression or trivial educational advance." *Hall v. Vance Co. Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985). "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *Carter v. Florence Co. Sch. Dist. Four*, 950 F.2d 156 (4th Cir.1991) (affirming district court's findings that an IEP providing only minimal progress was inappropriate). When determining progress, the district court must consider and rely upon objective factors, such as actual educational progress, to avoid substituting the court's judgment for that of school authorities. *MM*, 303 F.3d at 532.

Defendants demonstrated Christopher's actual progress during the 1999–2000 school year by pointing to his improvements on the Maryland Functional Reading and Math Tests, coupled with a significant increase in his grade in mathematics. Christopher also received several As and Bs, but primarily received Cs in Oral and Written Communication, Science and Social Studies. Christopher participated in a school-wide writing contest called "Write–A–Book" and his project was selected as the best entry from the entire sixth grade. Finally, his classroom teacher selected him as the most improved child in her sixth grade class for the 1999–2000 school year. These indicia of educational benefit from an IEP are real and significant.

Pace seeks to undermine this showing by argument and by seeking to insert into the record an unauthenticated document apparently created after the hearing from which this case arises. She argues, for example, that there is no evidence supporting a finding as to the grade level(s) to which the functional tests apply. Nevertheless, Christopher's improved performance on the tests is an obvious demonstration of actual progress. Pace also asserts that when Christopher was enrolled in a second public school in Prince George's County after the hearing in this case, that school created a record that he had *not* passed the Maryland Functional Math Test. I agree with the defendants that this back-door attempt to supplement the record with an unauthenticated document not presented to the ALJ cannot be countenanced as a viable attack on the ALJ's contrary findings. Finally, Pace also argues that the writing award does not demonstrate Christopher's actual progress because she helped him with his spelling, writing, and artwork. Pace presents nothing, however, to evidence that this success was the product of private instruction (or assistance) rather than the IEP. *See MM*, 303 F.3d at 533 n. 13 (noting that although some of child's progress may be attributable to in-home instruction, nothing showed that progress was "in large part" a result of private instruction rather than the IEP).

**542**

In short, looking to Christopher's progress during the 1999–2000 school year on the functional tests, his improved grades in several classes, his success in the "Write–A–Book" contest, and his selection as the most improved child in his class, the ALJ reasonably concluded that defendants adduced sufficient evidence of actual progress to support the conclusion that they provided Christopher with a FAPE during the 1999–2000 school year.

## V. Conclusion

For the reasons stated above, the motion for summary judgment shall be granted. An order follows.

### ORDER

For the reasons stated in the foregoing Memorandum, it is this 20th day of November, 2002, by the United States District Court for the District of Maryland ORDERED

(1) That the Motion for Summary Judgement is GRANTED; and it is further ORDERED

(2) That JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS AGAINST PLAINTIFF; and it is further ORDERED

(3) That the Clerk shall CLOSE THIS CASE and TRANSMIT a copy of this Order and the foregoing Memorandum to all counsel.